UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____  )
                          )
MARIA MIARA,              )
                          )
         Plaintiff,       )
                          )
         v.               )  CIVIL ACTION
                          )  NO.04-12188-WGY
FIRST ALLMERICA FINANCIAL LIFE  )
INSURANCE COMPANY,        )
JOSEPH F. BONASERA,       )
BAKER ASSOCIATES INSURANCE  )
AGENCY, AND               )
GARY M. BAKER             )
                          )
         Defendants.      )
_____  )
```

MEMORANDUM AND CERTIFICATION

YOUNG, C.J.                                    June 16, 2005

## I.  INTRODUCTION

How's this for a problem on a first year torts or civil

procedure exam?

Plaintiff A sues Defendant B in state court for
misrepresentation and other state causes of action in the
sale of a product that Plaintiff A alleges does not function
in the manner represented.  Misrepresentation claims have
been recognized in common law courts in the United States
and throughout the English-speaking world for centuries.

The product in question is a pension plan/profit sharing
plan that falls within the ambit of the Employee Retirement
Income Security Act ("ERISA").  Defendant B is the insurance
agent and agency who sold Plaintiff A the policy.

Defendant B removes the case to federal court on the
ground that ERISA preempts the jurisdiction of the state
courts.  What is more, Defendant B moves to dismiss the case

1

on the ground that, notwithstanding Plaintiff A's viable
misrepresentation and other state claims, ERISA provides no
remedy for such claims and, in fact, extinguishes them in
this context. Compare Andrews-Clarke v. Travelers Ins. Co.
984 F. Supp. 49 (D. Mass. 1997) (ERISA extinguishes
insurer's liability for otherwise viable state wrongful
death claim). Plaintiff A moves to remand the case to state
court where the claims will at least remain alive.

What ought the Court do?

A.  Remand the case, it's only fair.
B.  Remand the case, it does not "arise under" federal law.
C.  Remand the case, Congress never intended ERISA
preemption to sweep so broadly.
D. Remand the case, the Supreme Court never intended its
preemption jurisprudence to reach so far and work such an
unjust result.
E.  All of the above.

The correct answer is "E." Maybe.


    A.    Facts

    The following recitation of facts is taken from the

Plaintiff's First Amended Complaint and Jury Demand ("Pl.'s First

Am. Compl.") [Doc. No. 1, Attach. 1], Pl.'s Mem. in Supp. of

Pl.'s Mot. to Remand ("Pl.'s Mem.") [Doc. No. 6], and Defendants

Baker and Baker Associates Opp'n to Pl.'s Mot. to Remand ("Baker

Opp'n") [Doc. No. 9]. The facts are largely uncontested. The

Plaintiff Maria Miara ("Miara") and her husband Richard Miara

(together, the "Miaras") owned a company called New England Chain

Link Fence Co., Inc. Pl.'s Mem. at 1. In 1989, Miara contacted

the defendant Gary Baker ("Baker") of the defendant company now

known as Baker Associates Insurance Agency, Inc. ("Baker

Associates"). Id. She "inquire[d] about establishing a pension plan or profit sharing plan for the company." Id. Baker brought in defendant Joseph Bonasera ("Bonasera") from what is now First Allmerica Financial Life Insurance Company ("First Allmerica," and collectively with Baker, Baker Associates, and Bonasera, the "Defendants") to discuss various plans with the Miaras. Id. Baker, Bonasera and the Miaras met on at least two occasions. Id. at 2. Miara claims that she "and her husband repeatedly explained that whatever plan they chose must have spousal survivor benefits, particularly for the [benefit] of [Miara], who was considerably younger than her husband." Id. at 2.

Baker and Bonasera suggested the Miaras use a Defined Benefits Plan. Id. Miara contends that "[t]hey represented that although the plan was more expensive to administer, it had a great advantage over alternative plans because the Pension Benefit Guaranty Corp ('[Pension Benefit]') guaranteed the plan." Id.; see also Baker Opp'n ¶ 2 (agreeing that Pension Benefit did "guarantee[] the plan"). Miara specifies that "[t]hey assured [her] and her husband that [Pension Benefit] guaranteed 100% spousal benefits in the event that anything were to happen to either [Miara] or her husband," without qualification. Pl.'s Mem. at 2. Miara claims that she relied on these representations

and, accordingly, chose the recommended Defined Benefits Plan,[1]
id., effective September 1, 1989.  Baker Opp'n ¶ 1.

Unfortunately, Miara's husband died in an automobile
accident on August 22, 1996.  Pl.'s Mem. at 2; Baker Opp'n ¶ 3.
Miara claims Bonasera told her "that in order to get the [Pension
Benefit] survivor benefits, she would have to close the company
and put it into bankruptcy."  Pl.'s Mem. at 2.  She asserts that,
again relying on Bonasera's advice, she "liquidated the company's
assets and filed for Chapter 7 bankruptcy protection."  Id.
Miara subsequently received several written notifications of the
spousal death benefits available to her.  See id.  In an October
8, 1996 letter, First Allmerica informed Miara that she could
collect $1,382.80 per month as of September 1, 1996, or $2,457.27
per month if she deferred her collection until February 1, 2002.
Id.; Baker Opp'n ¶ 4.  At this time, asserts Miara, Bonasera
"reiterated that [Miara] would get the full spousal benefit
regardless of which option she chose because of [Pension
Benefit]'s guaranty."  Pl.'s Mem. at 2.  On December 4, 1996,
Miara informed First Allmerica that she elected to defer the
receipt of benefits until February 2002.  Id.

The second notification, dated January 6, 1997, informed

_____

[1] The parties do not contest that the policy obtained by
Miara is in fact an employee benefit plan under ERISA. See 29
U.S.C. §§ 1002 (1), (3); Wickman v. Northwestern Mut. Life Ins.
Co., 908 F.2d 1077, 1082-1083 (1st Cir. 1990)

Miara "of an error in the October 8, 1996 death benefit
information." Id. at 3. First Allmerica notified Miara that
though the calculation of $1,382.80 per month as of September 1,
1996, remained the same, deferring payment until February 1, 2002
would result in a monthly benefit of $1,952.97, and deferring
until February 1, 2006 would result in receipt of a monthly
benefit of $2,664.35. Id.; Baker Opp'n ¶ 5. The letter further
stated, according to Miara, that monthly benefit payments would
begin "on February 1, 2006, unless written consent to commence
payments as of an earlier date is received." Pl.'s Mem. at 3
(internal quotations omitted); Baker Opp'n ¶ 5. Miara elected to
receive the benefits as of February 1, 2006 and, as such,
expected she would receive $2,664.35 every month as of that date.
Pl.'s Mem. at 3.

The third communication, dated more than five years later on
June 12, 2002, yet again modified the amount Miara was to
receive. Id. "To her great shock and chagrin," Miara was
informed "that she was entitled to a monthly survivor payment of
just $531.76 a month if she deferred payment until February 1,
2006, and only $415.84 a month if she opted for an early
retirement option - more than $2,000 less than what First
Allmerica had assured her she would receive." Id.; Baker Opp'n ¶
6. This was Miara's first notification that she would not
receive the full spousal benefits Baker and Bonasera had

5

allegedly promised her.  Pl.'s Mem. at 3.  Miara appealed Pension
Benefit's determination, which  was denied by letter dated June
12, 2003.  Pl.'s First Am. Compl. ¶ 18; Pl.'s Mem. at 3; Baker
Opp'n ¶ 7.  Pension Benefit informed Miara that the reduction in
benefits was due to the fact that "she and her husband were
'substantial owners' of the company and the plan had terminated
early."[2]  Pl.'s First. Am. Compl. ¶ 18; Pl.'s Mem. at 3.  Miara
contends that "[Pension Benefit]'s 'substantial owner'
limitations were, or should have been, well known by Baker, Baker
Associates, Bonasera and [First] Allmerica" and that "[e]ach of
the defendants should have disclosed the limitations to [Miara]
and her husband prior to their purchasing the plan, but did not."
 Pl.'s First. Am. Compl. ¶ 20.  Miara contends she was repeatedly
assured, even after her husband's death, that there were no
limitations on her benefits, and that she purchased the plan
"specifically in reliance upon the representations by Baker and
Bonasera that they were guaranteed to receive full spousal
benefits."  Id. ¶¶ 21-22.

    Miara's complaint, "consists of [seven] state-law claims,
each of which targets Defendants' alleged misrepresentations in
procuring the . . . policy."  See Giannetti v. Mahoney, 218 F.

---

        [2] Survivor benefits for a "substantial owner" are
"substantially" limited when a plan is terminated early.  A
"substantial owner" holds more than five percent of a company's
stock.  Pl.'s First. Am. Compl. ¶ 19;  Pl.'s Mem. at 3.

Supp. 2d 8, 10 and n.2 (D. Mass. 2002)(Neiman, M.J.); Pl.'s First

Am. Compl. ¶¶ 23-55.  The state law claims are:

   (1) promissory estoppel
   (2) negligent misrepresentation
   (3) malpractice
   (4) breach of contract
   (5) breach of guaranty
   (6) breach of the covenant of good faith and fair dealing,
   and
   (7) violation of Massachusetts General Laws chapter 93A.

Pl.'s First Am. Compl. ¶¶ 23-55.  The Defendants raise

affirmative defenses in their answers, one of which is that

federal ERISA law preempts Miara's state claims.  Accordingly, on

October 19, 2004, Baker and Baker Associates removed this matter

to federal court.  Notice of Removal to the United States

District Court [Doc. No. 1].  Arguing that her state law claims

are not preempted by ERISA, Miara asks this court to remand the

matter to the Massachusetts Superior Court on the ground that

this Court lacks subject matter jurisdiction. Pl.'s Mot. to

Remand [Doc. No. 5].  Parties have filed memoranda in support of

their respective positions.[3]  See Pl.'s Mem.; Baker Opp'n; Def.

Bonasera Opp'n to Pl.'s Mot. to Remand [Doc. No. 12] ("Bonasera

Opp'n").  This Court must now decide whether it has jurisdiction

over this matter or whether it ought remand the case to the

courts of the Commonwealth.

---

[3]First Allmerica has not filed an opposition to the motion
to remand.  Bonasera's brief opposition does not include a
recitation of facts but focuses instead on the legal argument.

7

## II.  DISCUSSION

### A.  Removal of State Cause of Action and Federal Jurisdiction

#### 1.  Removal

Defendants may remove from state court actions over which original jurisdiction is granted to the federal courts. Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 10 (1983) (explaining that original jurisdiction must be established by plaintiff's claims).  "A removing defendant bears the burden of establishing the existence of federal jurisdiction."  Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1356 (11th Cir. 1996).  In the context of ERISA, where Congress deliberately and "completely preempt[ed] a particular area . . . [claims are] necessarily federal in character."  Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64 (1987).  Accordingly, defendants may, by statutory dictate, remove a case "arising under" or "relating to" ERISA to federal court.[4]  28 U.S.C. § 1441.

#### 2.  ERISA Preemption

---

[4] "Defendant can remove a case when plaintiff relies on federal law for its claim, though plaintiff is perfectly willing to entrust the federal claim to a state court, but neither party can take the case to federal court if defendant relies on federal law as a defense to a nonfederal claim by plaintiff. . . . [This] is now so firmly entrenched that only a statutory amendment could change it."  Charles Alan Wright and Mary Kay Kane, Law of Federal Courts at 226 (6th ed. 2002) (emphasis added).

The Supreme Court has identified two kinds of ERISA claims, those which arise under ERISA's civil enforcement provision, 28 U.S.C. § 1132(a),[5] and those claims against ERISA entities that are "run-of-the-mill state-law claims," Memorial Hosp. Sys. v. Northbrook Life Ins. Co., 904 F.2d 236, 243, 248 (5th Cir. 1990)(quoting Mackey v. Lanier Collection Agency & Serv. Inc., 486 U.S. 825, 833 (1988)), the latter of which are not preempted. Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1284 (6th Cir. 1991) (citing Mackey, 486 U.S. at 833); see also Children's Hosp. Corp. v. Kindercare Learning Ctrs., Inc., 360 F. Supp. 2d 202, 207 (D. Mass. 2005) (Saris, J.) ("[C]onflict preemption is a defense to a state claim and does not create subject matter jurisdiction." (citing Danca v. Private Health Care Sys., Inc., 185 F.3d 1, 4-5 (1st Cir. 1999)).[6]  As the First Circuit

---

[5] "In certain areas . . . Congress has demonstrated such a strong intent to preempt that any claims brought in that area (even if purportedly raising only state law claims) are necessarily federal in character and may be removed.  This is known as complete preemption." Nahigian v. Leonard, 233 F. Supp. 2d 151, 165 (D. Mass. 2002).  "In addition to comprehensively regulating certain employees welfare benefit plans, ERISA specifically preempts most state laws that 'relate to' plans covered under ERISA." Fitzgerald v. Codex Corp., 882 F.2d 586, 587-88 (1st Cir. 1989).

[6] In Danca, the First Circuit explained complete preemption and emphasized fundamental ERISA section 514 conflict preemption principles: At times, as in Miara's case, "the state court complaint allege[s] only causes of action under state law.  On its face, . . . the complaint presents no federal question.
          But there is an exception to this practice of focusing on the face of the complaint.  Where a claim, though couched in the language of state law, implicates

explained,

> ERISA is a comprehensive statutory scheme that governs
> employee benefit plans. . . . [ERISA] contains an express
> preemption clause providing that it shall "supersede any and

―――――――――――――――――――

> an area of federal law for which Congress intended a
> particularly powerful preemptive sweep, the cause is
> deemed federal no matter how pleaded.  This exception
> to the well-pleaded complaint rule is called "complete
> preemption."
> We pause here to emphasize the difference between
> complete preemption, a concept associated with
> jurisdiction, and the affirmative federal defense of
> ERISA § 514 preemption. <u>Standing alone, the likelihood
> or even certainty of defendants' raising a colorable
> ERISA § 514 preemption defense is no basis for federal
> jurisdiction. ERISA preemption, without more, does not
> convert a state law claim into an action arising under
> federal law</u>. . . . ERISA § 514 is not relevant to the
> complete preemption analysis; courts look instead only
> to ERISA § 502(a) [for complete preemption
> determinations], which contains ERISA's exclusive civil
> enforcement provisions.
> To establish complete preemption, defendants must
> show that the state cause of action falls within the
> scope of ERISA § 502(a).

185 F.3d 4-5 (internal citations omitted) (emphasis added); <u>see
also</u> Hotz v. <u>Blue Cross & Blue Shield of Mass., Inc.</u>, 292 F.3d
57, 59 (1st Cir. 2002) ("[U]nder the doctrine of 'complete
preemption,' ERISA's civil enforcement provisions, 29 U.S.C. §
1132(A), have been interpreted to establish federal removal
jurisdiction over any state law claims that in substance seek
relief that is otherwise within the scope of those ERISA remedy
provisions."); <u>id.</u> ("[F]ederal <u>defenses</u> including preemption do
not by themselves confer federal jurisdiction over a well-pleaded
complaint alleging only violations of state law.").

This Court explained that "[i]n the ERISA context, state law
claims are completely preempted and thus removable only if: 1)
they are preempted by ERISA because they '<u>relate to</u>' an employee
benefit plan <u>and</u> 2) they fall 'within the scope' of Section
502(a) of ERISA i.e. ERISA's exclusive civil enforcement
provision." <u>Nahigian</u>, 233 F. Supp. 2d at 165 (deciding
preemption issue after determining plaintiff's standing)
(citations omitted) (emphasis added).  As this is not the case
here, Miara's claims must be reviewed for conflict preemption.

all State laws insofar as they may now or hereafter <u>relate</u> <u>to</u> any ". . . employee benefit plan." Thus, when state-law claims "<u>relate to</u>" ERISA plans, those claims are transmuted into ERISA claims.  In that situation, "any civil complaint raising such a state law claim . . . is of necessity so federal in character that it arises under federal law for purposes of 28 U.S.C. § 1331 and permits removal to federal court."  (internal citations and alterations omitted) (alterations and emphasis added).

<u>Carpenters Local Union No. 26</u> v. <u>United States Fid. & Guar.</u> <u>Corp.</u>, 215 F.3d 136, 139 (1st Cir. 2000).

**B.    Remand to State Court: Standard of Review**

Where federal jurisdiction is lacking, a federal court may remand a matter on its own motion, <u>see</u> <u>Wisconsin Dep't of Corr.</u> v. <u>Schacht</u>, 524 U.S. 381, 392 (1998) (indicating a court has the authority to remand a matter sua sponte) or, as here, on a motion of either party.  "[U]pon a motion to remand, the burden is upon the removing party to show that federal subject matter jurisdiction exists."  <u>Giannetti</u>, 218 F. Supp. 2d at 10 (citing <u>BIW Deceived</u> v. <u>Local S6, Indus. Union of Marine & Shipbuilding</u> <u>Workers of Am.</u>, 132 F.3d 824, 830-31 (1st Cir. 1997) and <u>Bally</u> v. <u>National Collegiate Athletic Ass'n</u>, 707 F. Supp. 57, 58 (D. Mass. 1998)).  Generally, "[d]oubts about the propriety of removing an action should be resolved in favor of remand."  <u>Giannetti</u>, 218 F. Supp. 2d at 10 (citation omitted).

###### C.    Significance of the Remand Decision

Should this Court decide to grant the motion to remand, such decision may not be appealed.  28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise"); but see Class Action Fairness Act of 2005, Pub. L. No. 109-2 (2005)[7].  This Court likewise understands the gravity of its decision for Miara, as denial of the motion to remand will, in effect, terminate her claims, "slam the courthouse doors in her face[,] and leave her without any remedy."  Andrews-Clarke, 984 F. Supp. at 53.  "[I]t is," indeed, "widely recognized that the absence of a comparable remedy under ERISA does not alter the analysis concerning preemption of the state law claims."  Id. at 55 n.26 (citing e.g. Turner v. Fallon Cmty. Health Plan, 127 F.3d 196, 198-200 (1st Cir. 1997)).  Nevertheless, this Court recognizes that if her claims are preempted, "[t]he result ERISA compels [this Court] to reach means [Miara] has no remedy, state or federal, for what may

---

[7] The Class Action Fairness Act of 2005 provides a possible appeal, at the discretion of the court of appeals, of a district court's decision to remand a class action to state court. 28 U.S.C. § 1453(c) (2005).  An appellant must apply "not less than seven days" after the remand order for such appeal, id. § 1453(c)(1), and the court of appeals must decide on the matter within sixty days, id. at § 1453(c)(2) (or 70 if a ten-day good cause or agreed upon extension applies, id. at § 1453(c)(3)) of the filing of appeal.  Should the court of appeals fail to review and decide such appeal within said time period, the appeal is denied. Id. at § 1453(c)(4).

have been a serious mistake." <u>Andrews-Clarke</u>, 984 F. Supp. at 53

(quoting <u>**Turner**</u> v. <u>**Fallon Cmty. Health Plan**</u>, 953 F.Supp 419, 424

(D.Mass. 1997) (Gorton, J.) <u>aff'd</u> 127 F.3d 196 (1st Cir. 1997).

This hardly seems just.[8]  <u>See</u> <u>id.</u> at 52.

## III. ERISA

### A.    The Purpose of ERISA

In a preemption analysis, one must be cognizant of the

original purposes of ERISA.  <u>New York State Conf. of Blue Cross &</u>

<u>Blue Shield Plans</u> v. <u>Travelers Ins. Co.</u>, 514 U.S. 645, 655 (1995)

("Since pre-emption claims turn on Congress's intent, we begin as

we do in any exercise of statutory construction with the text of

the provision in question, and move on, as need be, to the

structure and purpose of the Act in which it occurs." (internal

citations omitted)); <u>Fort Halifax Packing Co., Inc.</u> v. <u>Coyne</u>, 482

U.S. 1, 8 (1987) (indicating that the intent of Congress when

---

[8] That a law may be unjust does not, of course, allow the
courts to ignore it.  This Court does not hesitate to implement
preemption where appropriate and required by law.  <u>See, e.g.,</u>
<u>Iwata</u> v. <u>Intel Corp.</u>, 349 F. Supp. 2d 135, 157 (D. Mass. 2004)
(holding Iwata's discrimination claim preempted by ERISA);
<u>Metropolitan Life Ins. Co.</u> v. <u>Socia</u>, 16 F. Supp. 2d 66, 70 (D.
Mass. 1998) (enforcing preemption as "it is well established that
state law actions to enforce the contractual terms of an ERISA
Plan are preempted by the federal statutory scheme" (citations
omitted)); <u>Andrews-Clarke</u>, 984 F. Supp. at 59 (declaring, despite
the "absurd result," that preemption was mandated); <u>Pariseau</u> v.
<u>Albany Int'l. Corp.</u>, 822 F. Supp. 843, 846 (dismissing state
claims for unfair and deceptive acts and practices as preempted
by ERISA).

enacting ERISA is the "ultimate touchstone" in the determination

of preemption); Spalding v. Reliance Standard Life Ins. Co., 835

F. Supp. 23, 29 (D. Mass. 1993) (citing the First Circuit

decision in McCoy v. Massachusetts Inst. of Tech., 950 F.2d 13,

17-18 (1st Cir. 1991), for the principle that, "to the extent

that grey areas exist, the policy rationale[s] permeating ERISA

'afford sound guidance' in assessing the scope of preemption.").

The purposes of ERISA have been fully articulated.[9]  ERISA

_____

[9] The Supreme Court's explanation in Fort Halifax, 482 U.S.
1, of the intent of Congress when enacting ERISA's preemption
clause may be the most notable elucidation:
> [The statements of ERISA's sponsors] reflect
> recognition of the administrative realities of employee
> benefit plans. [A]n employer that makes a commitment
> systematically to pay certain benefits undertakes a
> host of obligations, such as determining the
> eligibility of claimants, calculating benefit levels,
> making disbursements, monitoring the availability of
> funds for benefit payment, and keeping appropriate
> records in order to comply with applicable reporting
> requirements. The most efficient way to meet these
> responsibilities is to establish a uniform
> administrative scheme, which provides a set of standard
> procedures to guide processing of claims and
> disbursement of benefits. Such a system is difficult to
> achieve, however, if a benefit plan is subject to
> differing regulatory requirements in differing States.
> A plan would be required to keep certain records in
> some States but not in others; to make certain benefits
> available in some States but not in others; to process
> claims in a certain way in some States but not in
> others; and to comply with certain fiduciary standards
> in some States but not in others.
> . . . .
> It is . . . clear that ERISA's pre-emption
> provision was prompted by recognition that employers
> establishing and maintaining employee benefit plans are
> faced with the task of coordinating complex
> administrative activities. A patch-work scheme of

is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." Shaw v. Delta Air Lines, 463 U.S. 85, 90 (1983) (citations omitted); see also id., 463 U.S. at 99 (indicating one purpose of ERISA was to "eliminat[e] the threat of conflicting or inconsistent State and local regulation of employee benefit plans" (quoting Senator Williams, 120 Cong. Rec. 299, 33 (1974))); Boston Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 439 (1st Cir. 1996) (explaining Congressional intention to "ensure uniformity in [ERISA-governed] plans by preventing states from imposing divergent obligations upon them."); Crespo v. Candela Laser Corp., 780 F. Supp. 866 (D. Mass. 1992) (explaining ERISA's "two-fold intent: to protect employees from the consequences of underfunding of pension and welfare benefit plans, as well as to protect employers from inconsistent state and local regulation of such plans").[10]

---

regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations.

Id. at 9, 11. Some have gone so far as to describe ERISA as "an emancipation proclamation" for employees. 120 Cong. Rec. 29,193 (Aug. 20, 1974) (statement of Sen. Biaggi); Andrews-Clarke, 984 F. Supp. at 56 n.28.

[10] In Andrews-Clarke, this Court clarified its memorandum in Crespo, 780 F. Supp. 866, and emphasized "that the second objective is ancillary to the first." 984 F. Supp. at 58 n.44.

15

ERISA was not intended to

> protect[] plan participants and their beneficiaries by
> requiring employers to provide any given set of minimum
> benefits, but instead <u>controls</u> the <u>administration of benefit</u>
> <u>plans</u>, as by <u>imposing reporting and disclosure mandates</u>,
> <u>participation and vesting requirements</u>, <u>funding standards</u>,
> and <u>fiduciary responsibilities for plan administrators</u>.  It
> envisions <u>administrative oversight</u>, imposes <u>criminal</u>
> <u>sanctions</u>, and establishes a <u>comprehensive civil enforcement</u>
> <u>scheme</u>.  It also pre-empts <u>some</u> state law.

<u>Travelers</u>, 514 U.S. at 651 (internal citations omitted) (emphasis added); <u>Massachusetts</u> v. <u>Morash</u>, 490 U.S. 107, 112 (1989) ("ERISA was passed by Congress . . . to safeguard <u>employees</u> from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." (emphasis added)). Yet, over time, "ERISA has evolved into a shield of immunity which thwarts the legitimate claims of the very people it was designed to protect." <u>Andrews-Clarke</u>, 984 F. Supp. at 56.  ERISA has, in fact, "gone conspicuously awry from its original intent.[11]  <u>Id.</u> at 65.

---

[11] <u>See</u> <u>DiFelice</u> v. <u>Aetna U.S. Healthcare</u>, 346 F.3d 442, 459–60 (3d Cir. 2003) (Becker, C.J. concurring) (noting this Court's "clear frustrat[ion]" in <u>Andrews-Clarke</u> and emphasizing, in the context of HMOs, that "[i]t is no exaggeration to say that the federal courts have struggled mightily to maintain fidelity to ERISA's expansive 'relates to' preemption clause while avoiding the wholesale foreclosure of participants' causes of action against their HMOs. . . . [O]ur search for a middle ground has proved to be a judicial snipe hunt, and we are no closer to success today than we were a decade ago. [The Third Circuit's] own decisions illustrate the quagmire in which courts find themselves.").

The Supreme Court has recognized that the issue of ERISA preemption has resulted in "an avalanche of litigation in the lower courts."  De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 809 n.1 (1997).  This is due partially to the existence of confusion within the bar, and "becomes yet another illustration of the glaring need for Congress to amend ERISA." Andrews-Clarke, 984 F. Supp. at 53 (footnote omitted).[12]  This

_____

[12] In Andrews-Clarke, this Court addressed the view of some that, in instances where no remedy exists, courts are to fashion remedies that promote the employee-focused purposes of ERISA. This Court specifically emphasized the Supreme Court precedent manifesting an "unwillingness to infer causes of action in the ERISA context."  984 F. Supp. at 60 and n.54 quoting Mertens, 508 U.S. at 254); see Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S.Ct. 2488, 2503 (2004) (Ginsburg, J. concurring) (directing attention to the concurring opinion of Chief Judge Becker in DiFelice, 346 F.3d at 453, and agreeing with, as Chief Justice Becker described, "the rising judicial chorus urging that Congress and the Supreme Court revisit what is an unjust and increasingly tangled ERISA regime," id.).  ERISA was certainly not enacted with a noli me tangere proclamation imposed upon it for all eternity; rather, it is the responsibility of Congress to address any existing deficiencies.  As such, this Court reiterates that it "can neither simply disregard its sworn oath to comply with the opinions of the Supreme Court, nor can it legislate by judicial decree nor apply a statute, such as ERISA, other than as drafted by Congress."  Andrews-Clark, 984 F. Supp. at 60 (internal quotations and citations omitted).
    Despite precedent to the contrary, Mauser v. Raytheon Co. Pension Plan for Salaried Employees, 239 F.3d 51, 57 (1st Cir. 2001) (noting that "[t]he Supreme Court has directed that federal courts may engage in interstitial rule-making when it is in the interests of justice"), the judicial branch is to interpret, not to reform, amend or redraft, laws.  See The Federalist No. 78, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The interpretation of the laws is the proper and peculiar province of the courts." (emphasis added)).  In fact, the judiciary, originally viewed as the "weakest" branch, 1 Baron de Montesquieu, The Spirit of Laws 167 (J.V. Prichard, ed. & Thomas Nugent, trans. 1914) ("Of the three powers..., the judiciary...

Court is intrigued by the argument made by Baker's counsel that "it would be very much in the interests of all . . . involved in this kind of work to get an answer [from] the First Circuit to the question whether these kind of misrepresentation[ and other state] claims are preempted or not."  Tr. of Mot. Hr'g of January 13, 2005, at 11.

### B.    ERISA PREEMPTION AND THE "RELATE TO" REQUIREMENT[13]

The Supreme Court has explained that it has:

> [A]ddresed claims of pre-emption with the starting presumption that Congress does <u>not</u> intend to supplant state law.  Indeed, in [the preemption context] . . . <u>where federal law is said to bar state action in fields of traditional state regulation</u> we have worked on the "assumption that the historic police powers of the States <u>were not to be superseded</u> by the Federal Act <u>unless</u> that was the <u>clear and manifest purpose</u> of Congress.

─────────────

is next to nothing."), is now described by some as "an important legal and political institution," Thomas G. Walker & Lee Epstein, The Supreme Court of the United States: An Introduction 21-22 (1993).

It is the position of this Court, however, that "the task of reforming ERISA 'so that it may continue to serve its noble purpose of safeguarding the interests of employees' falls squarely upon the shoulders of Congress."  <u>Andrews-Clarke</u>, 984 F. Supp. at 60 (citing <u>Corcoran</u>, 965 F.2d at 1338-39); <u>see</u> <u>Berlin City Ford, Inc.</u> v. <u>Roberts Planning Group</u>, 864 F. Supp. 292, 296 (D.N.H. 1994) (stating that courts should not "create a new federal common law remedy").

[13]<u>Pilot Life Ins. Co.</u> v. <u>Dedeaux</u>, 481 U.S. 41, 46 (1987) (citing legislative history reflecting the view of a key sponsor of ERISA, Representative John H. Dent, who described ERISA's preemption provision as its "crowning achievement"); <u>Crespo</u>, 780 F. Supp. at 869 n.5.

<u>Travelers</u>, 514 U.S. at 654-55 (internal citations omitted) (emphasis added).  One may well question whether it was, in fact, the "clear and manifest purpose" of Congress to preempt state law claims such as Miara's.  Indeed, "for the first time in our history, business has a good chance of opting out of the legal system altogether."  William G. Young, An Open Letter to U.S. District Court Judges, The Fed. Law., July 2003, at 33 ("An Open Letter").

This Court must determine whether Miara's claims arise out of or "relate to" the benefit plan such that they are preempted by section 514 of ERISA.  29 U.S.C. § 1144(a).[14]  "There is no bright line test for determining when claims 'relate to' an employee benefit plan; each case must be decided on its particular facts."  <u>Trans-Lease Group, Inc.</u> v. <u>Spiegel</u>, 7 Mass. L. Rptr. 330, 1997 WL 564366, at *3 (Mass. Super. Ct. Sept. 2, 1997) (Cratsley, J.) (citing <u>Pace</u> v. <u>Signal Tech. Corp.</u>, 417 Mass. 154, 160 n.5 (1994)).  "The type [of] relationship any given state law-based legal claim is required to have with an employee benefit plan in order to apply ERISA's preemption provision has been the subject of a fair amount of debate."

_____

[14] Section 514(a) provides that ERISA will "supersede any and all State laws insofar as they may now or hereafter <u>relate to</u> any employee benefit plan."  29 U.S.C. § 1144(a) (emphasis added).  "State law" includes "statutory mandates, court decisions, and all other sources of state law."  <u>Andrews-Clarke</u>, 984 F. Supp. at 56 n.30; 29 U.S.C. § 1144(c)(1).

_Parisi_ v. _Trustees of Hampshire Coll._, 711 F. Supp. 57, 61 (D. Mass. 1989) (Freedman, C.J.); _Trans-Lease Group,_ 1997 WL 564366, at *3 (noting "there is considerable authority on both sides of the preemption issue").

The Supreme Court in _Ingersoll-Rand, Co._ v. _McClendon_ set the standard in determining whether a state claim "relates to" an ERISA-covered plan. 498 U.S. 133, 139-42 (1990); _Hampers_ v. _W.R. Grace & Co, Inc._, 202 F.3d 44, 49 (1st Cir. 2000) (explaining "[e]xpress ERISA preemption analysis . . . involves two central questions: (1) whether the plan at issue is an employee benefit plan and (2) whether the cause of action _relates to_ this employee benefit plan." (quoting _McMahon_ v. _Digital Equip. Corp._, 162 F.3d 28, 36 (1st Cir. 1998)) (internal quotation marks omitted) (emphasis added)).

**C.    Supreme Court Jurisprudence**

    1.    **Expansive Application of ERISA's "Relate To" Language**

The Supreme Court's initial expansive reading of the ERISA preemption provisions is to blame for the breadth of the ERISA preemption doctrine today.[15] To reiterate, the analysis is two-

---

[15] This Court addressed the problem with expansive ERISA preemption in _Alshrafi_ v. _American Airlines, Inc._:
> The sweeping nature of recent Supreme Court preemption jurisprudence has been the subject of considerable comment, much of it critical.  _See, e.g._, _Andrews-_

step: first, a court must determine that a plaintiff has standing

> Clarke v. Travelers Ins. Co., 984 F. Supp. 49, 53 & n.
> 20 (D. Mass. 1997) (noting with frustration that under
> ERISA preemption jurisprudence, it "had no choice but
> to pluck [the plaintiff's] case out of the state court
> in which she sought redress (and where relief to other
> litigants is available) and then, at the behest of [the
> defendants], to slam the courthouse doors in her face
> and leave her without any remedy"); Betsy J. Grey, Make
> Congress Speak Clearly: Federal Preemption of State
> Tort Remedies, 77 B.U. L.Rev. 559, 561 (1997)
> (commenting that "corporations have attempted to turn
> [federal statutes] from regulatory swords into private
> shields"); Calvin Massey, "Joltin' Joe Has Left And
> Gone Away": The Vanishing Presumption against
> Preemption, 66 Alb. L.Rev. 759, 759 (2003) (commenting
> that the Supreme Court's preemption jurisprudence has
> reduced the "presumption against preemption" into
> merely a "ceremonial federalism"); Caleb Nelson,
> Preemption, 86 Va. L.Rev. 225, 229 (2000) (noting that
> "conservative advocates of federalism and liberal
> advocates of government regulation have joined in
> arguing that the current tests for preemption risk
> displacing too much state law"); David G. Owen, Federal
> Preemption of Products Liability Claims, 55 S.C. L.Rev.
> 411, 412 (2003) (observing that "[d]espite the best
> efforts of courts and commentators to bring order to
> the chaos, the law on federal preemption has
> obstinately refused to set anchor in enduring
> principles" (footnote omitted)); Donald P. Rothschild,
> A Proposed "Tonic" with Florida Lime to Celebrate Our
> New Federalism: How to Deal with the "Headache" of
> Preemption, 38 U. Miami L.Rev. 829, 830-31 & n.3 (1984)
> (noting that "present preemption doctrines interfere
> with a state's right to supplement federal regulation
> in order to afford greater protection for citizens
> residing within its borders"); see also Judith Resnik,
> Constricting Remedies: The Rehnquist Judiciary,
> Congress, and Federal Power, 78 Ind. L.J. 223, 309 n.
> 460 (2003) (noting that a majority of the Supreme Court
> has been willing to override state law in preemption
> cases). Still, it is bedrock that Supreme Court
> decisions bind the analysis of this Court, and this
> Court follows such precedents respectfully and
> completely.

Alshrafi, 321 F. Supp. 2d 150, 156 n.7 (D. Mass. 2004) (emphasis
added).

to sue as a "participant" or "beneficiary" of an employee benefits plan. <u>Firestone Tire & Rubber Co.</u> v. <u>Bruch</u>, 489 U.S. 101, 116 (1989) (referring to the subjacent circuit court decision). As Miara meeting this requirement is not in dispute, the next question is whether her claims are sufficiently "related to" the plan in order for ERISA preemption to apply. This latter phrase has contributed a great deal to the current state of confusion. <u>Doricent</u> v. <u>American Airlines, Inc.</u>, No.CIV.A.91-13084-Y, 1993 WL 437670, at *7 (D. Mass. Oct. 19, 1993) (Over time, the "relate to" language has become "essentially meaningless" and resulted in "havoc.").

Hitherto, the Supreme Court had stated that a state law claim "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." <u>Shaw</u>, 463 U.S. at 96-97. It is troubling that a plaintiff's claims and remedies are at the mercy of such unfettered language. As the Supreme Court acknowledged:

> The governing text of ERISA is clearly expansive. . . . [O]ne might be excused for wondering, at first blush, whether the words of limitation ("insofar as they . . . relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course for, [r]eally, universally, relations stop nowhere . . . [W]e have to recognize that our prior attempt to construe the phrase "relate to" does not give us much help drawing the line here.

<u>Travelers</u>, 514 U.S. at 655 (citation omitted). Congress may well

22

have used broad language to "establish pension plan regulation as exclusively a federal concern." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46 (1987) (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504 (1981)); Framingham Union Hosp. v. Travelers Ins. Co., 721 F. Supp. 1478, 1490 (D. Mass. 1989) (Skinner, J.) (citing Pilot Life, 481 U.S. 41). It is simply beyond belief, however, that Congress actually intended the "broadly sweeping arm" of ERISA, Turner, 953 F. Supp. at 424, to envelope any and all state law claims, no matter how remote, effectively extirpating years of common law consumer protection in one fell swoop.

The Supreme Court, recognizing the existing obfuscation, narrowed its "relate to" jurisprudence in Travelers and its progeny. 514 U.S. 645. To emphasize that "the mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies," Ingersoll-Rand, 498 U.S. at 142 (quoting English v. General Elec. Co., 496 U.S. 72, 87 (1990) (indicating one "must look for special features warranting pre-emption") (internal quotations and citation omitted)), to put "relate to" preemption in a proper context, and to curb the swelling confusion of such preemption, the Supreme Court announced a new,[16] "pragmatic approach" to the "relate to"

---

[16] This is actually a clarification and reiteration of prior Supreme Court decisions, which, perhaps rather nebulously, had previously articulated the same objectives of ERISA preemption.

framework.  It indicated that one should begin, as "in any

exercise of statutory construction[,] with the text of the

_____

The Supreme Court summarized this in <u>Travelers</u>:
>   As we have said before, § 514 indicates Congress's intent to
>   establish the regulation of employee welfare benefit plans
>   as "exclusively a federal concern." <u>Alessi</u> v. <u>Raybestos-</u>
>   <u>Manhattan, Inc.</u>, 451 U.S. 504, 523 . . . (1981). We have
>   found that in passing § 514(a), Congress intended
>>      []to ensure that plans and plan sponsors would be
>>      subject to a uniform body of benefits law; the goal was
>>      to minimize the administrative and financial burden of
>>      complying with conflicting directives among States or
>>      between States and the Federal Government . . ., [and
>>      to prevent] the potential for conflict in substantive
>>      law . . .requiring the tailoring of plans and employer
>>      conduct to the peculiarities of the law in each
>>      jurisdiction." <u>Ingersoll-Rand</u>, 498 U.S. at 142, 111
>>      S.Ct. at 484
>   This objective was described in the House of Representatives
>   by a sponsor of the Act, Representative Dent, as being to
>   "eliminat[e] the threat of conflicting and inconsistent
>   State and local regulation." 120 Cong.Rec. 29197 (1974).
>   Senator Williams made the same point, that "with the narrow
>   exceptions specified in the bill, the substantive and
>   enforcement provisions . . . are intended to preempt the
>   field for Federal regulations, thus eliminating the threat
>   of conflicting or inconsistent State and local regulation of
>   employee benefit plans." <u>Id.</u>, at 19933.  The basic thrust of
>   the pre-emption clause, then, was to avoid a multiplicity of
>   regulation in order to permit the nationally uniform
>   administration of employee benefit plans.
514 U.S. at 656-57 (alternations in original).
The Supreme Court also indicated, in <u>Ingersoll-Rand</u>:
>   Particularly disruptive is the potential for conflict in
>   substantive law.  It is foreseeable that state courts,
>   exercising their common law powers, might develop different
>   substantive standards applicable to the same employer
>   conduct, requiring the tailoring of plans and employer
>   conduct to the peculiarities of the law of each
>   jurisdiction.  Such an outcome is fundamentally at odds with
>   the goal of uniformity that Congress sought to implement.
498 U.S. at 142. Such concerns are absent in the matter before
this Court.

provision in question, <u>and move on, as need be</u>,[17] to the structure and <u>purpose</u> of the Act in which it occurs." <u>Id.</u> at 655 (citing <u>Ingersoll-Rand</u>, 498 U.S. at 138 (footnote added)).  The Supreme Court further stated, "[w]e simply must go beyond the unhelpful text . . ., and look instead to the <u>objectives of the ERISA statute</u> as a guide to the scope of the state law that Congress understood would survive." <u>Travelers</u>, 514 U.S. at 656; <u>Coyne</u> v. <u>Delany Co.</u>, 98 F.3d 1457, 1468 (4th Cir. 1996).

> **2.**   **Supreme Court Jurisprudence Applicable to Miara's State Law Claims**

To begin, it is worth noting that the Supreme Court has addressed, however marginally, the situation before this Court. In <u>Metropolitan Life Ins. Co.</u> v. <u>Massachusetts</u>, 471 U.S. 724 (1985), the Supreme Court stated that state "laws that regulate <u>only the insurer</u>, or the <u>way in which it may sell insurance</u>, do <u>not</u> 'relate to' benefit plans." <u>Id.</u> at 741 (emphasis added). The matter <u>sub judice</u> does not involve state regulation per se; nevertheless, traditional common law misrepresentation and malpractice claims, certainly address the manner in which an insurer may sell insurance.  The question which seemingly gets to

---

[17] It is interesting to observe that the <u>Travelers</u> approach mirrors the position articulated by the Supreme Court a decade earlier with regard to preemption under section 301 of the Labor Management Relations Act.  <u>See</u> <u>Allis-Chalmers Corp.</u> v. <u>Lueck</u>, 471 U.S. 202, 208 (1985) ("[T]he question whether a certain state action is pre-empted by federal law <u>is one of congressional intent</u>."(emphasis added)).

the heart of the preemption issue present in both <u>Metropolitan Life</u> and here is this: do laws that address the manner in which an insurer sells insurance sufficiently "relate to" ERISA plans? After <u>Metropolitan Life</u>, the answer seems to be "no."  Though analogous only, <u>Metropolitan Life</u> is persuasive in this Court's preemption determination.

## D. A Review of the Decisions of the United States Courts of Appeals

Prior to reviewing First Circuit case law, it is helpful briefly to summarize the decisions of other circuits that this Court has considered in arriving at its decision.  Such decisions provide insight into the "relate to" language and address cases akin to this situation.   Specifically, the Second, Third, Fourth, Fifth, Eighth, Ninth, Tenth and Eleventh Circuits have all held that state law claims, identical or sufficiently similar to Miara's state causes of action, do not "relate to" an employee benefit plan and that preemption is improper.  Though the Sixth and Seventh Circuits[18] have seemingly spoken in a manner adverse to Miara's position, this Court views such case law as distinguishable from Miara's situation.

### a. Second Circuit

In <u>Rebaldo</u> v. <u>Cuomo</u>, 749 F.2d 133 (2d Cir. 1984), the Second

---

[18]And, arguably, the First Circuit.

Circuit held that a state law regulating how much hospitals could charge employee benefit plans "related to" such plans in "too tenuous, remote or peripheral a manner to warrant" preemption. Id. at 138 ("[The] suggestion that, because this regulation affects pension plans in their dealings with hospitals by increasing their costs of doing business, it must be found preempted, proves altogether too much. . . . That argument does not withstand scrutiny.  So too, for example, do State laws and municipal ordinances regulating zoning, health, and safety increase the operational costs of ERISA trusts, but no one could seriously argue that they are preempted." (internal citations and quotation marks omitted)); United Wire, Metal and Mach. Health and Welfare Fund v. Morristown Mem'l Hosp., 995 F.2d 1179, 1193-1196 (3d Cir. 1993) (explaining that, despite the Supreme Court's decision in Ingersoll-Rand, the "touchstone" of the analysis in Rebaldo still applies); accord American Progressive Life & Health Ins. Co. v. Corcoran, 715 F.2d 784, 787 (2d Cir. 1983) (explaining that "the State's purported regulatory actions are not directed at any particular plans or at employee benefit plans in general . . . [but] at the business conduct of a company that happens to sell insurance policies to ERISA plans. . . . [W]hatever slight effect the Regulation may have on benefits is extrinsic to the aim of the Regulation and so peripheral to ERISA plans that it cannot justifiably be characterized as an attempt

to govern such plans under the guise of state insurance regulation.").

In <u>Gilbert</u> v. <u>Burlington Indus., Inc.</u>, conversely, the Second Circuit held that unlike in <u>American Progressive</u>, the state claims did "relate to" an employee benefit plan because "the state law claims seeking to enforce the severance pay policy would determine whether any benefits are paid, and directly affect the administration of benefits under the plan. . . . [T]he plaintiffs here were employed in 16 different states.  The policy favoring national uniformity in this field, therefore, strongly supports preemption."  765 F.2d 320, 327 (2d Cir. 1985).  Such a matter is readily distinguishable from the case before this Court.  Unlike <u>Gilbert</u>, preemption here would not support the application of uniform benefits or encourage employer compliance with law.  <u>See</u> <u>id.</u> at 329.

### b. Third Circuit

In <u>Painters of Phila. Dist. Council No. 21 Welfare Fund</u> v. <u>Price Waterhouse</u>, 879 F.2d 1146 (3d Cir. 1989) (involving, in relevant part, a determination of the existence of an implied federal common-law cause of action under ERISA), the Third Circuit held that causes of action for professional malpractice are rooted in state law.  <u>Id.</u> at 1152-1153.  The Third Circuit first emphasized that ERISA was intended to benefit the beneficiaries of employee benefit plans.  <u>Id.</u> at 1152.  It then

28

cogently continued to expound upon professional liability claims
as being the traditional domain of state law, not federal, by
emphasizing that "<u>state law</u> has traditionally prescribed the
standards of professional liability and, in the absence of clear
indicia in the act or legislative history, we are reluctant to
ascribe to Congress an intention to intrude in this area." <u>Id.</u>
at 1152-1153 (explaining the lack of indication that Congress
intended to create a cause of action for professional malpractice
claims under ERISA) (emphasis added).

Unpersuaded by appellant's preemption argument, the Third
Circuit, citing the Supreme Court decision in <u>Mackey</u>, 486 U.S.
825 (1988), stated that:

> lawsuits against ERISA plans for run-of-the-mill state-law
> claims such as unpaid rent, failure to pay creditors, or
> even torts committed by an ERISA plan – are relatively
> commonplace. . . . [T]hese suits, although obviously
> affecting and involving ERISA plans and their trustees, are
> not preempted by ERISA § 514(a).

<u>Painters</u>, 879 F.2d at 1153 n.7 (quoting <u>Mackey</u>, 486 U.S. at 833)
("We feel that professional malpractice actions brought by a plan
are directly analogous to the situation in <u>Mackey</u>, and that, in
the absence of an explicit corresponding provision in ERISA
allowing a professional malpractice cause of action, Congress did
not intend to preempt a whole panoply of state law in this area.
Thus, we conclude that ERISA does not generally preempt state
professional malpractice actions."). It is difficult to believe

that preemption would be warranted in the situation presented here, involving not the plan but a remote, third-party insurance agent and company.

In <u>United Wire</u>, 995 F.2d 1179 (ruling New Jersey's hospital rate regulation scheme was not preempted by ERISA), the Third Circuit provided an extremely thorough and helpful analysis of ERISA's "relate to" provision. <u>Id.</u> at 1191-1196 (describing federal ERISA preemption as a "thorn[y]" question). Though issued prior to the Supreme Court decision in <u>Travelers</u>, the Third Circuit's guidance presciently anticipates its theme: "A rule of law relates to an ERISA plan if it is specifically designed to affect employee benefit plans, if it singles out such plans for special treatment, or if the rights or restrictions it creates are predicated on the existence of such a plan." <u>Id.</u> at 1192 ("Where there is no direct nexus between a state statute and ERISA plans, no effect on the manner of such plans' conducting business or their ability to operate in interstate commerce, statutes have been upheld despite the fact that they may have the indirect ultimate effect of increasing plan costs." <u>Id.</u> at 1193.).

The Third Circuit also provided an analogy that resonates with this Court: "Where," like the matter before this Court, "a reference to an ERISA plan can be excised without altering the legal effect of . . . [state law] in any way, we believe the

30

reference should be regarded as without legal consequence for §
514(a) purposes.  Thus, for example, a state statute providing
that no employer, including an ERISA plan, shall discriminate on
grounds of race or gender[,] would not be preempted despite its
reference to an ERISA plan." Id. at 1192 n.6 (internal quotation
marks and citation omitted) (emphasis added).

### c. Fourth Circuit

The Fourth Circuit has spoken compellingly and definitively
on the preemption of state law claims when "non-fiduciary . . .
insurance professionals" in the role of "designers of . . .
insurance plans" are involved. Coyne & Delaney Co. v. Selman, 98
F.3d 1457, 1460, 1464 (4th Cir. 1996).  The Fourth Circuit in
Coyne held that, "[i]n light of the Supreme Court's recent (and
narrowing) interpretation of the scope of ERISA preemption in
[Travelers,]" the "malpractice claim is not preempted because it
does not 'relate to' an employee benefit plan within the meaning
of ERISA's preemption provision." Id. at 1466-67 (citations and
footnote omitted).  The Fourth Circuit restated the view
articulated by the Supreme Court in Travelers that "courts never
'assume[] lightly that Congress has derogated state regulation,"
but "[i]nstead courts 'address claims of preemption with the
starting presumption that Congress does not intend to supplant
state law." id. at 1467 (quoting Travelers, 514 U.S. at 654). The
Fourth Circuit emphasized that "[t]his is especially true in

31

cases involving fields of traditional state regulation." Id. (emphasis added).

The Fourth Circuit, guided by the "pragmatic" Supreme Court decision in Travelers, next looked to Congressional intent when enacting ERISA, and the three specific areas in which Congress could have been said to have intended preemption. Id. at 1468 (noting the three areas were: (1.) preemption of state laws that "mandate employee benefit structures or their administration;" (2.) "preemption of state laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself;" and (3.) preemption of "state laws providing alternative enforcement mechanisms for employees to obtain ERISA plan benefits." (internal quotation marks and citations omitted)). The court concluded that, "[b]y contrast . . . Congress did not intend to preempt 'traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities,' including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries." Id. at 1469 (quoting Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir. 1996) and noting the consistency of its decision with case law of the Fifth and Sixth Circuits and other courts) (emphasis added, alteration in original).

The Fourth Circuit stated that with respect to the

malpractice claim in that case, "[t]he gravamen of the claim is

that defendants, <u>in their capacities as insurance professionals</u>,

negligently failed to obtain a replacement insurance plan . . .

that provided the same coverage and benefits as the [current]

policy." <u>Coyne</u>, 98 F.3d at 1470 (emphasis added).  The Fourth

Circuit concluded:

> Permitting . . . [the] claim to go forward in no way
> threatens ERISA's objectives of protecting the interests of
> participants in employee benefit plans and their
> beneficiaries, by establishing standards of conduct,
> responsibility, and obligation for fiduciaries and by
> providing for appropriate remedies, sanctions, and ready
> access to the Federal courts.  Allowing . . . [the] claim to
> survive is fully consistent with the purposes of ERISA's
> preemption provision.  [The] . . . claim does not subject
> plan administrators and plan sponsors to conflicting
> directives among States or between States and the Federal
> Government.  Nor does it create the potential for conflict
> in substantive law requiring the tailoring of plans and
> employer conduct to the peculiarities of the law of each
> jurisdiction.  [The] . . . state law claim simply does not
> threaten Congress's goal of nationally uniform
> administration of employee benefit plans.  Thus, a finding
> of preemption in this case is not necessary to protect the
> objectives of ERISA.
>
> . . . .
>
>     . . . There is no question that [the state] . . . claim
> is rooted in a field of traditional state regulation.
> Common law professional malpractice, along with other forms
> of tort liability, has historically been a state concern.
> Moreover, a common law professional malpractice claim is a
> generally applicable law that makes no reference to, or
> functions irrespective of, the existence of an ERISA plan.

<u>Id.</u> at 1470-1471 (ruling state law claims were not preempted)

(internal quotation marks, citations, omissions and alterations

omitted).

d. **Fifth Circuit**

The Fifth Circuit in <u>Perkins</u> v. <u>Time Ins. Co.</u>, a decision rendered prior to the Supreme Court's decision in <u>Travelers</u>, stated that "[w]hile ERISA clearly preempts claims of bad faith as against insurance companies <u>for improper processing of a claim for benefits</u> under an employee benefit plan," the court was "not persuaded that this logic should extend to immunize agents from personal liability for their solicitation of potential participants in an ERISA plan prior to its formation.  898 F.2d 470, 473 (5th Cir. 1990) (emphasis added).  The Fifth Circuit held "that a claim that an insurance agent fraudulently induced an insured to surrender coverage under an existing policy, to participate in an ERISA plan which did not provide the promised coverage, 'relates to' that plan only indirectly . . . [and] is not preempted by ERISA."  <u>Id.</u> at 473 (concluding, with respect to the liability of an insurance agent when soliciting participants in an ERISA plan prior to its formation, that "an agent for a disclosed principal may be held liable personally where it can be shown the agent engaged in fraud or similar conduct." <u>Id.</u> at 474.) (citations omitted).

In another case, <u>Memorial Hosp. Sys.</u> v. <u>Northbrook Life Ins. Co.</u>, the Fifth Circuit reviewed a claim for unfair and deceptive trade practices, a claim the lower court characterized as a "derivative claim for plan benefits."  904 F.2d at 243.  The

Fifth Circuit, holding that the claim was not preempted by ERISA, stated:

> [T]he preemption clause of ERISA must be read in context with the Act as a whole, and with Congress's goal in creating an exclusive federal enclave for the regulation of benefit plans.  The Court has also cautioned that "ERISA preemption analysis 'must be guided by respect for the separate spheres of governmental authority preserved in our federalist system.'"

Id. at 244 (quoting Fort Halifax, 482 U.S. at 19).  The Fifth Circuit in Memorial Hosp. also reiterated the importance of the relationship of the parties in the preemption determination.  904 F.2d at 249 (citing its earlier decisions in Perkins, 898 F.2d at 473, and Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters. Inc., 793 F.2d 1456, 1467-68 (1987)).

The Fifth Circuit once again persuasively addressed preemption, in a case factually similar to the one before this Court, in its 2003, post-Travelers decision in Hobson v. Robinson, 75 Fed.Appx. 949, slip op. (5th Cir. 2003) (unpublished opinion).[19]  Hobson involved a suit for state law claims of fraud, misrepresentation and breach of contract.  Id. at 950. These claims were filed in state court and later removed to

_____

[19] This Court continues to regard unpublished opinions of other circuits as persuasive authority.  For this Court's recently articulated explication, see Corrigan v. Barnhart, 352 F. Supp. 2d 32, 44 n.3 (D. Mass. 2004) ("This Court . . . will treat the holding of unpublished opinions as persuasive authority, as it has done in the past.").

federal court.[20]  Id.  The district court held the state law
claims preempted and, accordingly, dismissed the entire case.
Id. at 951.  Initially, the Fifth Circuit held that, under Pilot
Life, 481 U.S. at 43, the breach of contract claims were
appropriately "preempted because those claims involve the
interpretation of the ERISA policy."  Id. at 952.  Yet, the
important distinction is, unlike Miara's claim, the breach of
contract claims in Hobson were for "contract actions asserting
[the] improper processing of a claim."[21]  75 Fed.Appx. at 952
(emphasis added).

    The Fifth Circuit also held that the "claims for fraud and
misrepresentation" were not to be preempted "because the
underlying conduct occurred in the inducement of an ERISA policy,
not in its administration."  Id. at 952 (emphasis added).  The
Fifth Circuit in Hobson provided a cogent summary of the
problematic nature of the "relate to" language and the Supreme
Court's mandate to look to the purpose of ERISA when determining
preemption.  It then articulated a preemption test:

---

    [20] Shortly thereafter, the plaintiffs in Hobson also filed a
separate federal action to receive unpaid benefits, after which
point defendants moved for removal. 75 Fed.Appx. at 951.

    [21] While this Court need not, and does not, reach the merits
of Miara's breach of contract claim, as will be discussed infra,
Miara asserts a breach of her contract with Defendants because
she never received, as allegedly promised, a plan with 100%
spousal benefits.

> [T]his Court applies a two-prong test; that is, this Court
> asks: (1) whether the claim addresses areas of exclusive
> federal concern and not of traditional state authority, such
> as the right to receive benefits under the terms of an ERISA
> plan, and (2) whether the claim directly affects the
> relationship among traditional ERISA entities -- the
> employer, the plan and its fiduciaries, and the participants
> and beneficiaries.

Id. at 953 (footnote omitted)  The Fifth Circuit concluded, "the

primary legal question in this case is whether ERISA preempts . .

. claims for fraudulent[] induc[ement] . . . to procure

coverage." Id. at 953.  It held it did not. Id at 955.

It is important to note that the Fifth Circuit indicated

that neither the timing of the purported violations of state law

(i.e., pre- or post-plan formation), id. at 954, nor whether an

insurance agent was an independent agent or was employed by a

company, id., were dispositive.  The Fifth Circuit, reemphasizing

its decision in Perkins, 898 F.2d at 473, held instead that "the

critical determination [is] whether the claim itself created a

relationship between the plaintiff and defendant that is so

intertwined with an ERISA plan that it cannot be separated."

Hobson, 75 Fed.Appx. at 954 (providing an overview of its

previous cases and highlighting once again that the Fifth Circuit

decisions since Perkins[22] reaffirm the importance of the

---

22 See Smith v. Texas Children's Hosp., 84 F.3d 152, 155 (5th
Cir. 1996) (holding "a claim escape[d] preemption" as it did "not
necessarily depend upon the scope of . . . rights under [the] . .
. ERISA plan."); Hubbard v. Blue Cross & Blue Shield Ass'n, 42
F.3d 942, 944 (5th Cir. 1995) (emphasizing that, in the

relationship between the parties.

e.  **Sixth Circuit**

The Sixth Circuit in <u>Perry</u> v. <u>P*I*E* Nationwide Inc.</u>, rather
interestingly, first held "that preemption should apply to a
state law claim only if Congress has provided a remedy for the
wrong or wrongs asserted."  872 F.2d 157, 162 (6th Cir. 1989)
(basing its decision on the Eighth Circuit decision in <u>Dependahl</u>
v. <u>Falstaff Brewing Corp.</u>, 653 F.2d 1208 (8th Cir. 1981), which
held that preemption is appropriate where Congress has occupied
the entire field and has provided a remedy for the asserted
wrong).  Two years later, in a matter in large part factually
dissimilar to the one before this Court, the Sixth Circuit went
the other way, ruling state law claims were preempted by ERISA.
<u>Cromwell</u>, 944 F.2d at 1275.  In <u>Cromwell</u>, a health care provider
was seeking the payment of unpaid insurance claims.  <u>Id.</u>  The
plaintiff brought various state claims for breach of contract,
promissory estoppel, negligence and breach of good faith.  <u>Id.</u>
Cromwell argued that the reason for its claims was "their
reasonable reliance on [the defendant's] oral assurances of
coverage" which were provided in response to inquiries on whether
the health care provided would be covered by the plan.  <u>Id.</u> at

---

determination of ERISA preemption, the important question is
whether the claim "require[s] an inquiry into . . . questions
[that] are intricately bound up with the interpretation and
administration of the ERISA plan." <u>Id.</u> at 946.)

38

1274-75. Here, the Sixth Circuit, noting that it had previously "repeatedly recognized that virtually all state law claims relating to an employee benefit plan are preempted by ERISA," id. at 1276 (citations omitted), stated that "[i]t is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit."  Id.

Judge Suhrheinrich's concurring opinion in Cromwell cites the factors considered by the Sixth Circuit as important in the preemption determination in Firestone Tire & Rubber Co. v. Neusser, 810 F.2d 550 (6th Cir. 1987).  Cromwell, 944 F 2d. at 1279 (Suhrheinrich, J. concurring); Firestone Tire, 810 F.2d at 555-56 (establishing the three-part inquiry: (1.) Whether "the state law represents a traditional exercise of state authority" (2.) Whether the state law "affects relations among the principal ERISA entities – the employer, the plan, the plan fiduciaries, and the beneficiaries", and (3.) What are the effects of state law on the plan?).  Judge Jones dissented.  Cromwell, 944 F 2d. 1272.  Judge Suhrheinrich said the problem with the dissenting opinion was its lack of consideration for the third-prong of the test.  944 F.2d at 1279 (Suhrheinrich, J. concurring) (noting that the dissent's failure could result in negative effects including: the plan will have to pay the judgment, "payment of the award will require actuarial adjustments," "assessment of

39

such judgments against a plan may reduce the amount available to the plan's beneficiaries and increase administrative costs," and that "the plan will . . . be subject to the laws of the individual states concerning the types of damages recoverable in tort."). These concerns, of course, are not applicable here. Though <u>Cromwell</u> may seem to run counter to Miara's interests, it is distinguishable in that: (1.) here, Miara does not seek the payment of benefits under the plan but restitution for her reliance on the alleged misrepresentations of the Defendants, (2.) payment of damages by the insurance agent, agency or company will not affect the plan in any way, and (3.) <u>Cromwell</u> was decided prior to the Supreme Court's instructive and constricting decision regarding ERISA preemption in <u>Travelers</u>. 514 U.S. at 645.

Judge Jones's dissenting opinion is especially compelling. Explaining that the plaintiff did not even have initial standing to sue under ERISA, he states:

> In affirming the district court in this case, the majority approves a procedure through which a district court may engage in a preemption analysis under ERISA before verifying the basis of its jurisdiction, or even before determining whether the complaint states a claim under ERISA at all. . . . [T]his procedure is emblematic of what seems to be an <u>overzealous readiness in the federal courts to bar all state-law claims which even smell of ERISA under the broad umbrella of preemption without engaging in the complex case-by-case analysis which the statute and precedent require</u>. As in this case, <u>the result of such a boiler-plate unreflective approach to ERISA preemption is to</u>

<u>frequently leave deserving claimants without recourse
in state or federal court</u>.  It is clear that Congress
intended ERISA preemption to be broad in scope.
However, some state actions may affect employee benefit
plans in too tenuous, remote or peripheral a manner to
warrant a finding that ERISA preemption is applicable.
It is my view that the proper procedure in this case
would have been for the district court, once it
accepted removal jurisdiction, to do a thorough
analysis of the basis of its jurisdiction . . . <u>before</u>
engaging in an analysis of the merits of the claims,
including preemption. . . . Had the district court
engaged in the standard blackletter practice of first
addressing jurisdictional issues, it would have
recognized that the plaintiff had no standing to sue
under ERISA because it was neither a participant nor a
beneficiary of an employee benefits plan.  The court
would then have properly turned to whether any of
plaintiff's claims were sufficiently related to the
benefits plan to require preemption despite the fact
that plaintiff could not claim under the plan.  In my
view, this procedure would have led the court to a
different conclusion than it reached in this
case-namely, that none of the plaintiff's claims either
stated a claim under the plan or were sufficiently
related to the plan to warrant preemption.

. . . .

    . . . [A] complex [analysis] is mandated by law to
ensure that valid claims by deserving parties are not
summarily dismissed with broad strokes by essentially
presuming preemption of any claim vaguely connected to
an employee benefits plan.

<u>Id.</u> at 1279-1280, 1286 (Jones, J. dissenting) (internal

citations, quotation marks, and alterations omitted)(emphasis in

original). The dissent, applying the three-prong test, noted that

preemption remained inappropriate.  <u>Id.</u> at 1285 (Jones, J.

dissenting) (noting, in its detailed analysis that Cromwell was

not a participant or beneficiary with standing to sue, and that

the monies she sought to recover were "for services independent

41

of any coverage under the plan"). This Court agrees with Judge
Jones's assertion

> that the courts have become consumed in a fervor of
> preemption, sometimes avoiding admittedly difficult and
> complex analysis, by simply presuming preemption to apply.
> The problematic nature of such a practice is exemplified in
> the case at bar. The plaintiffs in this case, good-faith
> health care providers who provided care in reliance upon a
> plan's verification of benefits, cannot seek a remedy in
> either state or federal court. . . . Thus, perhaps
> inadvertently the majority has enabled plan administrators,
> either intentionally or not, to give misinformation of
> coverage and avoid any inquiry into the validity of a health
> care provider's claims against them.

Id. at 1286 (Jones, J. dissenting)(citation and footnote
omitted).

### f.  **Seventh Circuit**

The Seventh Circuit, in a case that mirrors Cromwell,
addressed a situation where a plan administrator confirmed
coverage of psychiatric medical treatment sought by plaintiffs
for their young daughter and the plaintiffs, in reliance on the
confirmation, agreed to the treatment. Pohl v. National Benefits
Consultants, Inc., 956 F.2d 126, 127 (7th Cir. 1992). The
Seventh Circuit held that the plaintiff's common law negligent
misrepresentation claim was preempted by ERISA. Id. at 128. In
so doing, the Seventh Circuit emphasized that

> [o]ne of ERISA's purposes is to protect the financial
> integrity of pension and welfare plans by confining benefits
> to the terms of the plans as written, thus ruling out oral
> modifications. . . . This purpose would be thwarted if
> participants could maintain suits under state law against a

> plan administrator that were based on oral representations
> of coverage.

Id. (citations omitted).  The Seventh Circuit does, indeed, state

that the plaintiffs were "not seeking to enlarge coverage as

such; but any money they obtained from this suit would be

functionally a benefit to which the written terms of their plan

do not entitle them.  This type of end run is regularly

rebuffed."  Id.  This could, arguably, be said of Miara's claims.

This Court, however, disagrees with that characterization.  The

primary difference between Miara's claims and those in Pohl is

that Miara's suit is not based only on oral representations of

coverage; at a minimum,  the letters sent subsequent to the

formation of the plan repeatedly confirmed the benefit she

purportedly was due.  Further,  Miara does not bring suit against

any entity in its capacity as a plan administrator, guarantor, or

fiduciary, but against the insurance company, agency, and agent

for their respective roles in the sale of the inadequate,

insufficient and misrepresented policy to the Miaras.

g.  **Eighth Circuit**

In Wilson v. Zoellner, 114 F.3d 713 (8th Cir. 1997), the

Eighth Circuit decided a case factually similar to the matter

before this Court.  Wilson involved a suit brought against an

insurance agent for negligent misrepresentation.  Id. at 715.

Wilson purchased a health insurance policy, seeking one that

43

provided coverage for work injuries.  <u>Id.</u>  As in the matter
before this Court, Zoellner allegedly misrepresented that the
policy included the specific coverage Wilson sought.  <u>Id.</u>  When
Wilson had an accident at work which left her severely injured
and paralyzed, benefits were denied and Wilson was told that the
policy did not cover work-related injuries.  <u>Id.</u>  Wilson's suit
against Prudential in federal court was fruitless as the Eighth
Circuit held that Prudential properly denied benefits. <u>Id.</u>
Wilson then sued Zoellner, the insurance agent, in state court
for negligent misrepresentation.  <u>Id.</u>  The district court held
that the state law was preempted by ERISA.  <u>Id.</u>

The Eighth Circuit reversed the district court's decision.
<u>Id.</u>  The court began by reviewing ERISA preemption generally, <u>id.</u>
at 715-716, and then stated that the law of negligent
misrepresentation in Missouri was a general law, with no specific
reference to an ERISA plan. <u>Id.</u> at 716-17.  The Eighth Circuit,
quoting the Supreme Court's decision in <u>California Div. of Labor
Standards Enforcement</u> v. <u>Dillingham</u>, 519 U.S. 316, 325 (1997),
noted that "the Supreme Court has directed [it] . . . to 'look
both to the objectives of the ERISA statute as a guide to the
scope of the state law that Congress understood would survive, as
well as to the nature of the effect of the state law on ERISA
plans.'" <u>Wilson</u>, 114 F.3d at 717.  The Eighth Circuit then
outlined the factors it considered when determining "the effect

of a state law on an ERISA plan":

> [1] whether the state law negates an ERISA plan
> provision, [2] whether the state law affects relations
> between primary ERISA entities, [3] whether the state
> law impacts the structure of ERISA plans, [4] whether
> the state law impacts the administration of ERISA
> plans, [5] whether the state law has an economic impact
> on ERISA plans, [6] whether preemption of the state law
> is consistent with other ERISA provisions, and [7]
> whether the state law is an exercise of traditional
> state power.

Id. at 717 (quoting Arkansas Blue Cross & Blue Shield v. St.

Mary's Hosp. Inc., 947 F.2d 1341, 1344-45 (8th Cir. 1991)

(alteration in original).  In applying the seven factors, the

Eighth Circuit "conclude[d] that no provisions in Prudential's

policy with [Wilson's employer] would be negated by allowing

Wilson's tort action to proceed against Zoellner for his alleged

misrepresentation of the scope of coverage of the policy."  Id.

at 717-718.  As Wilson was "not seeking benefits under the . . .

policy," preemption was improper.  Id. at 718 (emphasis added).

The court also held that it was "apparent that . . . [the] tort

claim neither affects the relations between primary ERISA

entities nor impacts on the structure of the ERISA plan."  Id. at

718.  The Eighth Circuit specifically bifurcated Prudential's

dual roles and stated that

> [i]f Prudential [were to] incur[] any liability as a
> result of th[e] suit, it w[ould] do so only as the
> employer of a tortfeasor, and not as a plan fiduciary.
> . . . Because Prudential does not face any liability
> incurred by its role as an ERISA entity, its
> relationship with other ERISA entities cannot be

45

effected by Wilson's suit.

Id.  The court also decided that Wilson's suit had no direct

economic impact on the ERISA plan, and that "it is apparent that

Missouri exercises a 'traditional state power' in adjudicating

claims of negligent misrepresentation in its courts . . . [as it]

has long recognized the tort of negligent misrepresentation."

Id. at 719-720.  The Eighth Circuit held that:

> [w]eighing these various factors together, we conclude
> that this Missouri state common-law action against an
> insurance agent for his alleged negligent
> misrepresentation of the scope of coverage of an
> employee benefit plan does not have a sufficient
> connection to the ERISA plan to require a finding of
> preemption.  We believe that this is particularly true
> in light of the declared purpose of ERISA: "to protect
> interstate commerce and the interests of participants
> in employee benefit plans and their beneficiaries." . .
> . 29 U.S.C. § 1001(b).

Id. at 720.[23]  A state's "efforts to prevent sellers of goods and

services, including benefit plans, from misrepresenting . . . the

scope of their services is 'quite remote from the areas with

which ERISA is expressly concerned -- reporting, disclosure,

fiduciary responsibility and the like."  Id. (quoting Dillingham,

519 U.S. at 330).  In light of the "totality of the

circumstances," the Eighth Circuit accordingly held that the

_____

[23] In so holding, the court cited the Eleventh Circuit
decision in Morstein v. National Ins. Servs.Inc., 93 F.3d 715
(11th Cir. 1996) (en banc), discussed infra.  See Wilson, 114
F.3d at 720-721 (quoting the Eleventh Circuit decision in
Morstein, 93 F.3d at 723-24, and citing also the Fifth Circuit
decision in Perkins, 898 F.2d 470, and the Sixth Circuit decision
in Perry, 872 F.2d 157).

negligent misrepresentation claim was related to the plan in "too
tenuous, remote, or peripheral," id. at 721 (quoting Shaw, 463
U.S. at 100 n.21), a manner to warrant preemption.[24]

h. **Ninth Circuit**

In The Meadows v. Employers Health Ins., 47 F.3d 1006 (9th
Cir. 1995), the Ninth Circuit addressed misrepresentations made
by an ERISA entity.  The Meadows, involved a suit for damages
based on misrepresentations made as to the scope of benefits and
coverage rather than for the payment of benefits under a plan.
Id. at 1008.  Employers Health Insurance removed the case to
federal court claiming the state claims were preempted by ERISA.
Id.  The district court decided the state claims were not

---

[24] The Eighth Circuit reached a different conclusion in Shea
v. Esensten, 107 F.3d 625 (8th Cir. 1997), a case that involved a
tort claim against a plan administrator that had failed to
disclose a limitation on a plan.  Id. at 627.  The Eighth Circuit
in Shea held that preemption was in line with its previous
holdings that tort claims against administrators were preempted
and that the outcome would have affected plan administration and
compliance with individual state disclosure requirements.  Id.;
see also Dependahl, 653 F.2d at 1215-16 (indicating that, unlike
Miara's case where no remedy has been provided, that "the thrust
of the former executives' argument against federal preemption of
the state tortious interference with contract cause of action
focuses on the lack of substantial damage such a cause of action
would have on the overall purpose of ERISA.  This argument,
however, misses the point.  If Congress has already provided a
remedy for the violation of the former executives' benefit plans,
then once Congress has expressed its intention to occupy the
field, the state law is preempted, regardless of whether or not a
conflict exists which involves a direct interference by the state
law with the substantive federal legislation.  Here, Congress has
provided a remedy for the wrong allegedly done." (emphasis
added)).

preempted by ERISA.  Id.  The Ninth Circuit affirmed the decision.  Id. at 1009 ("We hold that the district court correctly concluded that the independent state law claims of The Meadows, a third-party provider, lie outside the bounds of the ERISA 'relates to' standard because neither The Meadows nor the [employees] had any existing ties to the ERISA plan [at the time of the misrepresentations].").

The Ninth Circuit rejected outright the argument that an ERISA plan was sufficiently involved because one needed to consult the policy in order to determine coverage.  Id. at 1010. The Ninth Circuit explained that "The Meadows' state law claims for misrepresentation and estoppel 'make no reference to' and 'function irrespective of' the existence of an ERISA plan."  Id. The Ninth Circuit, citing the Fifth Circuit's decision in Memorial Hosp., 904 F.2d at 247, emphasized that "insulating plan fiduciaries from the consequences of their own misrepresentations to third-party providers does not further any of ERISA's objectives."  The Meadows, 47 F.3d at 1010).[25]

---

[25] This Court has also considered the Ninth Circuit decisions in Farr v. U.S. West Communications, Inc., 151 F.3d 908, 911, 912-913 (9th Cir. 1998) (deciding preemption of state fraud and misrepresentation claims appropriate in a suit against an employer with fiduciary duties for misrepresenting tax consequences resulting from an ERISA plan); Geweke Ford v. St. Joseph's Omni Preferred Care Inc., 130 F.3d 1355 (9th Cir. 1997) (holding that a state breach of contract claim by an employer against a third party plan administrator for failure to reimburse employer as required by contract was not preempted by ERISA).

i.  **Tenth Circuit**

The Tenth Circuit examined state law claims[26] by an employer
against an insurer for fraud and unfair trade practices in
Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170
F.3d 985 (10th Cir. 1999).  In Woodworker's, the disagreement
between the parties arose from inadequate rate determinations and
the failure to disclose the method used to determine such rates,
resulting in unanticipated charges and rate increases for the
employer.  Id. at 989.  The Tenth Circuit noted that "ERISA does
not preempt all state law claims.  It has no bearing on those
[state law claims] 'which do not affect the relations among the
principal ERISA entities, the employer, the plan, the plan
fiduciaries and the beneficiaries as such.'"  Woodworker's, 170
F.3d at 990 (quoting Hospice of Metro Denver, Inc. v. Group
Health Ins. of Okla. Inc., 944 F.2d 752, 756 (10th Cir. 1991))

---

[26] In determining whether ERISA preempted the state law
claims, the Tenth Circuit delineated the
four causes of action that "relate to" a benefit plan for
purposes of ERISA preemption.  They involve (1) laws
regulating the type of benefits or terms of ERISA plans; (2)
laws creating reporting, disclosure, funding or vesting
requirements for such plans; (3) laws providing rules for
calculating the amount of benefits to be paid under such
plans; and (4) laws and common-law rules providing remedies
for misconduct growing out of the administration of such
plans.

Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170
F.3d 985, 990 (10th Cir. 1999) (citing Airparts Co., Inc. v.
Custom Benefit Servs. of Austin, 28 F.3d 1062, 1064-1065 (10th
Cir. 1994) and National Elevator Indus. v. Calhoon, 957 F.2d
1555, 1558-59 (10th Cir. 1992)).

(citation and alterations omitted).  The Tenth Circuit also
explained that claims affecting relationships between an ERISA
entity and a non-ERISA entity "similarly escape preemption."
Woodworker's, 170 F.3d at 990 (quoting Airparts, 28 F.3d at
1065).  "While the scope of ERISA preemption may be broad,"
emphasized the court, "it is certainly not boundless."
Woodworker's, 170 F.3d at 990 (citing Monarch Cement Co. v. Lone
Star Indus. Inc., 982 F.2d 1448, 1452 (10th Cir. 1992)).

        The Tenth Circuit, in arriving at its holding, cited case
law from other circuits denying preemption for suits against an
"insurance professional for misrepresentations that induced plan
participation," namely the decisions of the Fourth Circuit,
Coyne, 98 F.3d at 1457, Fifth Circuit, Perkins, 898 F.2d at 470,
Eighth Circuit, Wilson, 114 F.3d at 713, and Eleventh Circuit,
Morstein, 93 F.3d at 717-18.  Woodworker's, 170 F.3d at 991
(distinguishing cases challenging the allocation of benefits
under an ERISA plan).  Notably, the Tenth Circuit also stated,

> Allowing Woodworker's claims to proceed is
> consistent with Congress' purpose in enacting ERISA,
> that is, to protect the interests of employees and
> other beneficiaries of benefit plans and establish
> uniform standards regulating such plans.  Holding
> insurers accountable for pre-plan fraud does not affect
> the administration or calculation of benefits, nor does
> it alter the required duties of plan fiduciaries.
> Conversely, were ERISA to preempt such claims,
> employees, whom Congress sought to protect, would find
> themselves unable to make informed choices regarding
> available benefit plans.  We agree . . . that a state's
> efforts to prevent sellers of goods and services,

> including benefit plans, from misrepresenting the scope
> of their services is quite remote from the area with
> which ERISA is expressly concerned—reporting,
> disclosure, fiduciary responsibility, and the like.

Id. at 991-92 (internal citations, quotations and alterations

omitted).

    Finally, the Tenth Circuit indicated that an insurance

company cannot seek refuge under a theory that it is a plan

fiduciary and that, as such, ERISA should preempt because it was

being sued "with respect to its pre-plan activity in its role as

seller of insurance, not as an administrator of an employee

benefits plan." Id. at 991.  The Tenth Circuit emphasized its

view that:

> In enacting ERISA, Congress intended to protect the
> integrity of employment benefit plans, not insurance
> companies.  It explicitly defined a plan fiduciary in terms
> of the function it performed for the plan, not whether it
> was an insurance company.  Courts have repeatedly held that
> insurers are not necessarily ERISA entities.  Moreover,
> [the Seventh Circuit] has indicated that an insurance
> company may suffer liability in a misrepresentation suit.
> Quite simply, we see no principled basis for distinguishing
> insurance companies from insurance professionals in this
> type of action.  We hold that ERISA does not preempt
> Woodworker's pre-plan fraud claims against its insurer, and
> affirm the district court on this point.

Id. at 992 (internal citations omitted) (emphasis added).

                    j.  **Eleventh Circuit**

    The Eleventh Circuit addressed the preemption of state law

claims against insurance agents and agencies in what has become a

                              51

bedrock case in this area, Morstein v. National Ins. Servs. Inc., 93 F.3d 715 (11th Cir. 1996) (en banc).  Though certainly not a problem confined to that circuit, the Eleventh Circuit in Morstein admitted that its "decisions in the ERISA preemption area have been neither consistent nor clear."  Id. at 718.

Morstein, who had a total hip replacement operation, brought a suit claiming that an insurance agent and agency fraudulently induced her to purchase a health care policy and forego major medical coverage.  Morstein, 93 F.3d at 717.  Morstein also alleged the negligent processing of her claims.  Id.  Morstein sued in state court for negligence, malfeasance, misrepresentations, and breach of contract.  Id.  The defendants removed the action to federal court arguing ERISA preemption. Id.  The district court found in favor of the insurance agent and agency.  Id.  The appellate panel, bound by the then prevailing precedent in the Eleventh Circuit in Farlow v. Union Cent. Life Ins. Co., 874 F.2d 791 (11th Cir. 1989), affirmed the district court's decision.  Morstein, 93 F.3d at 717.  The Eleventh Circuit granted en banc review of the case.  Morstein v. National Ins. Servs., Inc., 81 F.3d 1031 (11th Cir. 1996).

The Eleventh Circuit proceeded to provide an exacting overview of the development of ERISA preemption law.  Morstein, 93 F.3d at 718-722 (outlining, in particular, the legislative history of ERISA, the original purpose of ERISA, and Supreme

52

Court case law).  Having found the Fifth Circuit decision in

Perkins persuasive (as does this Court), the Eleventh Circuit

indicated that it would overrule its previous decisions and

"adopt the [Perkins] rationale."  Id. at 722.  Accordingly, it

held that "when a state law claim brought against a non-ERISA

entity does not affect relations among principal ERISA entities

as such, then it is not preempted by ERISA."  Id.  ("Congress did

not intend for ERISA preemption to extend to state law tort

claims brought against an insurance agent.").  Further, the court

stated that a comparison of what was received under the current

plan as compared to what would have been received under the old

plan was insufficient to establish preemption.  Id. at 723

(citing Forbus v. Sears Roebuck & Co., 30 F.3d 1402, 1406-1407

(11th Cir. 1994) ("[T]he mere fact that the plaintiffs' damages

may be affected by a calculation of pension benefits is not

sufficient to warrant preemption."), and Travelers, 514 U.S. at

645 (establishing that economic impact alone is insufficient to

warrant preemption of state law)).  The court continued, in

language this Court finds exceedingly persuasive:

> [T]he possibility that insurance premiums will be
> higher or that insurance will be more difficult to
> obtain because independent agents will have less
> incentive to sell insurance to employers whose employee
> benefit plans will be governed by ERISA, does not
> provide a reason to preempt state laws that place
> liability on agents for fraud.  These same agents
> currently face the threat of state tort claims if they
> make fraudulent misrepresentations to individuals and
> entities not governed by ERISA.  To hold these agents

accountable in the same way when making representations about an ERISA plan merely levels the playing field.

. . . <u>Allowing preemption of a fraud claim against an individual insurance agent will not serve Congress's purpose for ERISA</u>. As we have discussed, Congress enacted ERISA to protect the interests of employees and other beneficiaries of employee benefit plans. <u>To immunize insurance agents from personal liability for fraudulent misrepresentation regarding ERISA plans would not promote this objective</u>. If ERISA preempts a beneficiary's potential cause of action for misrepresentation, employees, beneficiaries, and employers choosing among various plans will <u>no longer be able to rely</u> on the representations of the insurance agent regarding the terms of the plan. <u>These employees, whom Congress sought to protect, will find themselves unable to make informed choices regarding available benefit plans where state law places the duty on agents to deal honestly with applicants</u>.

<u>Morstein</u>, 93 F.3d at 723-24 (reversing the grant of summary judgment and concluding that the "claims do not fall within ERISA's broad preemptive scope, as they do not have a sufficient connection with the plan to 'relate to' the plan.") (emphasis added)(citation omitted).

k. **First Circuit**

The First Circuit has not ruled on "whether ERISA preempts state law claims against an insurer, an insurance agency, and an insurance agent stemming from misrepresentations made by the insurance agent (acting on behalf of the insurer) prior to the establishment of the employee benefit plan in question." <u>Stetson</u> v. <u>P.F.L. Ins. Co.</u>, 16 F. Supp. 2d 28, 31 (D. Me. 1998). The First Circuit has acknowledged that "[d]rawing the line between

54

those state laws that 'relate to' ERISA-regulated plans, and those that are only 'tenuous, remote or peripheral' has proven to be considerably difficult in practice." <u>Hampers</u>, 202 F.3d at 49 (quoting <u>De Buono</u>, 520 U.S. at 809 n.1 and noting such difficulty has resulted in an "avalanche of litigation").  This circuit has emphasized the strain between courts on either side of the preemption issue.  <u>Carlo</u> v. <u>Reed Rolled Thread Die Co.</u>, 49 F.3d 790, 793 (1st Cir. 1995) ("Courts have struggled over whether ERISA preempts claims of misrepresentation regarding the scope or existence of benefits, and 'there is ample, well reasoned authority which would support either position.'" (quoting <u>Pace</u>, 417 Mass. 154).

The First Circuit has stated that the "[c]ourts finding that misrepresentation claims are not preempted have reasoned that the mere fortuity that the misrepresentation involved pension benefits is insufficient to cause the 'axe of federal preemption to fall.'"  <u>Carlo</u>, 49 F.3d at 793 (quoting <u>Greenblatt</u> v. <u>Budd Co.</u>, 666 F. Supp. 735, 742 (E.D. Pa 1987) and citing <u>Pace</u>, 417 Mass. at 156 which stated that where "resolution of state law claims will neither 'determine whether any benefits are paid' nor 'directly affect the administration of benefits under the plan,' the claims do not 'relate to' ERISA and accordingly are not preempted.").  The "<u>promise</u> to provide the plaintiff with certain benefits . . ., <u>upon which plaintiff could reasonably rely</u>, is

55

the essence of the [misrepresentation] alleged." <u>Carlo</u>, 49 F.3d at 794 (quoting <u>Greenblatt</u>, 666 F. Supp. at 742) (emphasis added)(alteration in original).  Those courts that find preemption inappropriate when applied to these state law causes of action are "troubled" that preemption in benefit suits involving misrepresentation acts as a "shield" for employers and "often leaves plaintiffs remediless" against employers.  <u>Carlo</u>, 49 F.3d at 794 (citing <u>Pace</u>, 417 Mass. at 160).  On the other hand, in ruling the state law claims preempted in <u>Carlo</u>, the First Circuit stated that courts on the other side of the struggle hold sacrosanct the sweeping preemption provision included in ERISA.  <u>Carlo</u>, 49 F.3d at 794 (quoting <u>Pilot Life</u>, 481 U.S. at 46).

Defendants place their principal reliance on <u>Carlo</u>, 49 F.3d 790, 794, and <u>Vartanian</u> v. <u>Monsanto Co.</u>, 14 F.3d 697, 700 (1st Cir. 1994).  In these two cases, the First Circuit decided state law claims were preempted by federal law and explained that the relevant inquiry in deciding preemption is whether a state claim "relates to" an ERISA plan.  <u>Carlo</u>, 49 F.3d at 794; <u>Vartanian</u>, 14 F.3d at 700.  Both <u>Carlo</u> and <u>Vartanian</u>, however, are readily distinguishable from the case before this Court.

In <u>Vartanian</u>, (a 1994, pre-<u>Travelers</u> case), the First Circuit held a state law action against a fiduciary for unlawful discrimination and misrepresentation preempted by ERISA.  14 F.3d

56

at 698, 700.[27]  In <u>Carlo</u>, 49 F.3d 790 (a 1995 pre-<u>Travelers</u>

case), the First Circuit held that an employee's suit against an

employer for negligent misrepresentation of the benefits they

would receive under an early retirement plan sufficiently

"related to" the plan to warrant ERISA preemption.  49 F.3d at

794.[28]

    In <u>Carlo</u>, the First Circuit held that "[d]espite the[]

cogent arguments against preemption in misrepresentation claims,"

ERISA preempted the Carlos's claims as such claims "related to"

_____

    [27] Vartanian was a participant in a 1986 employee pension
plan.  14 F.3d at 698.  Under the 1986 plan, Vartanian had
several retirement options from which to choose.  <u>Id.</u>  He opted
for a lump sum distribution and submitted the request at least
one year before his retirement took effect.  <u>Id.</u>  A few months
prior to his effective retirement date, Vartanian heard that his
employer was going to implement an employee retirement plan that
was favorable to employees.  <u>Id.</u>  Upon repeated inquiries to the
employer, Vartanian was assured and reassured that no new plans
were to be put in place.  <u>Id.</u> at 698-699.  Yet, only about two
months after Vartanian's retirement date, at the end of June,
1991, the employer indeed put in place the preferred, employee
incentive plan.  <u>Id.</u> at 699.  Vartanian alleged that he was not
allowed to make a reasoned, informed decision as a result of the
employer's statements and "fail[ure] to disclose its
consideration of an enhanced severance program."  <u>Id.</u>

    [28] Carlo was offered early retirement and told by the
employer the amount of benefits available to him under the plan.
<u>Id.</u> at 792.  Six months later, Carlo was informed that his
benefits were approximately twenty percent less than that which
the employer had earlier represented to him.  <u>Id.</u>  The employer
admitted in writing the error in calculating the benefits and
apologized.  <u>Id.</u>  He offered Carlo the opportunity to return to
work in the position he had held.  <u>Id.</u>  Carlo did not accept the
offer by the given deadline, and was presumed to reject the
offer, thus accepting the erroneously calculated early retirement
benefits.  <u>Id.</u>

an employee benefit plan, id. (citing the purpose of ERISA and
legislative history in support of its holding), and have "a
connection with or reference to" the early retirement plan.  Id.
The First Circuit continued:

> [t]o compute these damages would require the court to refer
> to the [plan] as well as the misrepresentations allegedly
> made by [the employer].  Thus, part of the damages to which
> the Carlos claim entitlement ultimately depends on an
> analysis of the [plan].  To disregard this as a measurement
> of their damages would force the court to speculate on the
> amount of damages.  Consequently, . . .the court's inquiry
> must be directed to the plan.

Id. at 793-794 (internal citations and quotation marks omitted)

Unlike Carlo (involving an employee and employer) and
Vartanian (involving a retired employee and employer/fiduciary),
this case involves a suit against insurance agents and insurance
companies, not employers, underwriters, or fiduciaries.  Compare
Giannetti, 218 F. Supp. 2d at 13 ("Plaintiffs' complaint does not
target the insurance company that underwrote the ERISA plan . . .
but, as indicated, consists of run-of-the-mill misrepresentation
claims against the agent and agency who allegedly procured the
wrong plan." (emphasis added)) with Dudley Supermarket, Inc. v.
Transamerica Life Ins. and Annuity Co., 302 F.3d 1, 4 (1st Cir.
2002) (holding preemption of state claims where "it [wa]s clear
that . . . Transamerica breached its fiduciary duty under ERISA
to provide competent investment advice and services rather than,
as appellants argue . . . [a] violat[ion of] run-of-the-mill

state laws that are largely tangential to and not preempted by ERISA." (emphasis added)(footnote omitted).

One need not exert a great deal of energy in distinguishing <u>Vartanian</u> from the case before this Court.  <u>Vartanian</u> himself seemed to acknowledge inherently that the claims related to a plan as he "exhausted all administrative procedures and plan appeal procedures in his claim for benefits."  <u>Vartanian</u>, 14 F.3d at 699.[29]  Miara has not so attempted here.  Further, in <u>Carlo</u>, the First Circuit did state that "part of the damages to which the Carlos claim entitlement ultimately depends on an analysis of the [plan].  To disregard this as a measurement of their damages would force the court to speculate on the amount of damages" to be received.  49 F.3d at 794.  Yet, here one need not look at the plan as the Defendants have made numerous representations regarding the benefits to which Miara believes she is entitled.

---

[29] This Court pauses also to address the oft-quoted language in <u>Vartanian</u> that "[t]here is simply no cause of action if there is no plan."  14 F.3d at 700 (citing <u>Ingersoll-Rand</u>, 498 U.S. at 140).  The language, however, is particular to those cases. <u>Ingersoll-Rand</u> involved a wrongful discharge to avoid contribution to, and payment of, pension plan benefits.  498 U.S. at 139-40.  <u>Vartanian</u>, though admittedly more tenuous, likewise involved an examination of the new, more favorable 1991 plan which, by virtue of its coming into existence, gave rise to Vartanian's claims.  14 F.3d at 700; <u>see also</u> <u>McMahon</u>, 162 F.3d at 38-39 (finding, in a case distinguishable from the one now before this Court, preemption of state claims where plaintiff had to prove "the existence of, or specific terms of, an ERISA plan," and where defendants were responsible for deciding eligibility for short-term disability leave).

It is meaningful to note that the First Circuit decisions in
Vartanian and Carlo were made prior to the Supreme Court's
decision in Travelers, 514 U.S. 645.  In Travelers, as discussed
supra, the Supreme Court narrowed the preemptive strike of ERISA,
instructing that courts need to "look . . . to the objectives of
the ERISA statutes as a guide to the scope of the state law that
Congress understood would survive."  Id. at 656.  Given this
newly-articulated guidance, would the First Circuit have arrived
at the same holding post-Travelers?  While this Court treats the
precedent of all of the circuits as persuasive authority, and of
course abides by its obligation to comply with the binding
precedent of the First Circuit, in this case this Court follows
as its primary mandate the precedent of the Supreme Court, namely
its most recent decision in Travelers.  Id. at 668.  As this
Court has noted on previous occasions, this Court cannot "'simply
disregard its sworn oath' to comply with the binding opinions of
the Supreme Court."  Putnam v. Town of Saugus, Mass., 365 F.
Supp. 2d 151, 182 (D. Mass. 2005) (quoting Andrews-Clarke, 984 F.
Supp. at 60).  As this Court stated in In re Bernstein,

> the doctrine of stare decisis ought not be . . . lightly
> discarded.  Where the Supreme Court has spoken to an issue,
> it is the duty of the lower federal courts to follow that
> analysis without regard to arguably changed conditions.
> Indeed, the First Circuit has . . . acknowledged the duty of
> the lower federal courts to follow the Supreme Court's
> "directly applicable precedent, even if that precedent
> appears weakened by pronouncements in its subsequent
> decisions, and to leave to the [Supreme] Court the
> prerogative of overruling its own decisions."

81 F. Supp. 2d 176, 181 (D. Mass. 1999)(quoting National Foreign

Trade Council v. Natsios, 181 F.3d 38, 59 (1st Cir. 1999)

(alterations in original).

Though Defendants seek to convince this Court of the

applicability of the two First Circuit cases to the matter before

this Court, it concludes those cases are distinguishable from the

matter here.   Moreover, this Court agrees with Judge Bownes's

general characterization in Golas v. HomeView, Inc., 106 F.3d 1,

4-6 (1st Cir. 1997) (Bownes, J. concurring)[30] that the First

------

[30] The district court in Golas had adopted the
recommendation of the magistrate to grant the motion to dismiss
all of the state law causes of action as preempted by ERISA and
to deny the plaintiff's motion to amend the complaint.  106 F.3d
at 2. In its 1997 decision in Golas, id., the First Circuit,
affirmed a decision that state claims for emotional distress and
loss of consortium against a disability insurer and an employer
were preempted by ERISA, yet never reached the preemption issue.
Id. at 3.  Golas turned largely on procedure:  Golas did not
appeal the preemption claims; rather, "[p]laintiff wished to add
a defendant to a case which was being dismissed as to the two
original defendants."  Id. at 2-3.  Though this Court does not
reiterate the entire procedural context here, it notes that the
appeal before the First Circuit was based on the decision of the
district court to deny Golas the opportunity to amend her
complaint to add an insurance broker as a party to the case.  Id.
at 3.  The majority in Golas emphasized that it "express[ed] no
opinion on the preemption issue . . . [and] does not, as the
concurrence claims, uphold the district court's preemption
decision sub silencio."  Id. (noting that "[i]f a motion is made
to add [the insurance broker] to the ERISA action, the court will
have the ability to consider the preemption issue anew in light
of the facts that have been developed in discovery.").  The First
Circuit, noting review on these grounds was for abuse of
discretion, explained that even under de novo review, it could
affirm the decision of the district court if there was "any legal
ground supported in the record."   Id.

Circuit has "never held that <u>Carlo</u> sweeps all state-law
misrepresentation claims into the ERISA corner merely because an
employee benefit plan exists."  <u>Id.</u> at 6; <u>Giannetti</u>, 218 F. Supp.
2d at 14.

Oddly, not one party here cited in their briefs or referred
at oral argument to <u>Hampers</u>, a First Circuit decision this Court
finds particularly compelling. 202 F.3d 44(involving the terms of
an employment agreement and an employee's right to be enrolled in
a plan and receive plan benefits).  In <u>Hampers</u>, the First Circuit
decided that a state law contract claim sufficiently related to
an employee benefit plan to be preempted by ERISA.  <u>Id.</u> 53-54.
In so holding, however, the First Circuit acknowledged that its
decision turned on defendant's role as "an ERISA employer and
fiduciary" who "exercised discretion and authority or control
respecting the management, disposition and administration of the
[plan]."  <u>Id.</u> at 53 (internal quotation marks omitted).

Most persuasive to this Court is the First Circuit's review
of the decisions of the other circuits, from which decisions it
distinguished <u>Hampers</u>:

> [T]<u>his is not a case</u> where the defendant is being sued for
> wrongful conduct committed in its <u>individual capacity</u>, <u>see</u>,
> <u>e.g.</u>, <u>Wilson</u> v. <u>Zoellner</u>, 114 F.3d 713, 715 (8th Cir. 1997)
> (claim of <u>misrepresentation against an insurance agent</u>);
> <u>Stetson</u> v. <u>PFL Ins. Co.</u>, 16 F. Supp. 2d 28, 29 (D.Me. 1998)
> (same); <u>see also</u> <u>Golas</u> v. <u>HomeView Inc.</u>, 106 F.3d 1, 4 (1st
> Cir. 1997) (Bownes, J., concurring) (<u>claim brought against
> insurance broker acting in his individual capacity</u>), nor is
> this a case where the defendant is a third party insurer or

> service provider who is <u>not an ERISA entity -- plan,</u>
> <u>employer, participant, beneficiary, fiduciary -- at all</u>,
> <u>see, e.g.</u>, <u>Woodworker's Supply Inc.</u> v. <u>Principal Mut. Life</u>
> <u>Ins. Co.</u>, 170 F.3d 985, 991 (10th Cir. 1999) (<u>claims against</u>
> <u>insurer for misconduct in selling</u> life insurance); <u>Geweke</u>
> <u>Ford</u> v. <u>St. Joseph's Omni Preferred Care, Inc.</u>, 130 F.3d
> 1355, 1357 (9th Cir. 1997) (contract claims against third
> party provider of insurance and administrative services); .
> . . . <u>Coyne & Delaney Co.</u> v. <u>Selman</u>, 98 F.3d 1457, 1460-61
> (4th Cir. 1996) (malpractice claim against insurance
> professionals).

<u>Hampers</u>, 202 F.3d at 53 (emphasis added).  As the First Circuit

cites Judge Bownes's concurring opinion in <u>Golas</u> as

distinguishable from <u>Hampers</u>, it can properly be inferred that

the First Circuit would not have held preemption appropriate

under the factual situations presented in <u>Wilson</u>, 114 F.3d 713,

<u>Woodworker's</u>, 170 F.3d 985, and <u>Coyne</u>, 98 F.3d 1457, or, for that

matter, here.

     Further still, the First Circuit in its 2002 decision in

<u>Dudley</u> specifically acknowledged the distinctions and noted that

it had, in that case,

> examined the many cases . . . [in] support of the[]
> assertion that claims based essentially on professional
> malpractice are not preempted by ERISA even though the
> claims involve in some way a plan governed by ERISA.  These
> cases, as significant here, simply indicate that the
> malpractice claims against the defendants there, <u>who were</u>
> <u>not fiduciaries with respect to an ERISA plan</u>, were <u>not</u>
> <u>preempted.</u>

302 F.3d at 4-5 (citations and internal quotations omitted)

(emphasis added).  Finally, in <u>McCoy</u> v. <u>Massachusetts Inst. of</u>

<u>Tech.</u>, 950 F.2d 13 (1st Cir. 1991), the First Circuit said that

"to the extent that gray areas exist, the policy rationales that permeate ERISA and its preemption clause can afford sound guidance in determining what state laws may survive." Id. at 17-18. This Court infers that the First Circuit precedent[31] requires a ruling that preemption is unwarranted and improper in the matter before this Court.

### l. **District of Massachusetts Case Law**

In addition to the First Circuit cases and the persuasive case law of the other circuits, there also exists persuasive case

---

[31] Also noteworthy is Nash v. Trustees of Boston Univ., 946 F.2d 960 (1st Cir. 1991). Though factually unrelated and decided prior to the Supreme Court's decision in Travelers and also prior to the First Circuit's Vartanian-Carlo-Golas-Hampers-Dudley line of cases, the decision has persuasive value nonetheless. In Nash, Boston University claimed a defense of fraud in the inducement of an ERISA plan by Nash, the beneficiary of that plan. The First Circuit, in what is seemingly a variation, or the converse of, the case here, stated:

[t]here is no clear indication in the language, structure, purpose or policy of ERISA, in its legislative history, or in the case law construing the statute, that Congress intended to eliminate the most elemental prerequisite to the formation of an enforceable contract–the meeting of the minds. Moreover, were we to conclude that so fundamental a principle as fraud in the inducement may not be asserted in defense to a claim for the enforcement of a putative ERISA benefit plan, the congressional purpose in chartering federal court development of a body of ERISA-related federal common law would be diminished to insignificance. We conclude that Congress did not intend to preclude development of an ERISA-related body of federal common law incorporating traditional common law standards governing whether the formation of an alleged ERISA benefit plan was fraudulently induced by its would-be beneficiary.

Id. at 966-967. It would seem that the "meeting of the minds" concept would apply irrespective of which party was inducing and which was being induced.

law on point in the courts of this district.  In <u>Cuoco</u> v. <u>NYNEX</u> <u>Inc.</u>, 722 F. Supp. 884 (D. Mass. 1989) (Skinner, J.), Cuoco sought relief for denial of coverage following her former husband's passing in reliance on promises made to her by NYNEX. Judge Skinner held that Cuoco's "claims arise not from the deprivation of any rights under the NYNEX plan but from the series of promises and misrepresentations which were allegedly made to her. . . ."  <u>Id.</u> at 886 (explaining that Cuoco "was lured into a false sense of security as to her health insurance and was prevented from seeking other arrangements").  Judge Skinner, distinguishing the case from <u>Pilot Life</u>, 481 U.S. 41, a case involving the improper processing of benefit claims, emphasized that "common law claims are preempted only if the relationship between the plaintiff and defendant is based on a plan governed by ERISA." <u>Cuoco</u>, 722 F. Supp. at 886-887 (noting, as argued by Miara here, that Cuoco's claims focused not on the plan but on the misrepresentations made and did not warrant preemption, <u>id.</u> at 887.).

Judge Skinner again addressed a similar situation in <u>Framingham Union Hosp.</u> v. <u>Travelers Ins. Co.</u>, 721 F. Supp. 1478 (D. Mass. 1989) (Skinner, J.).  <u>Framingham Union Hosp.</u> involved, in part, the failure to disclose disadvantages of an ERISA plan. <u>Id.</u> at 1482.  Judge Skinner again held that state law claims for professional malpractice, misrepresentation, negligence, and

Chapter 93A of the Massachusetts General Laws were not preempted by ERISA.  Id. at 1490 ("None of these causes of action purports to impact the administration of the Plan, provision of benefits or any like concern of ERISA.  The possibility that the terms of ERISA or the Plan may be evidence of certain aspects of the claim do not mandate their preemption.").

In Industrial Tech. Servs. v. Phoenix Home Life Mut. Ins. Co., 866 F. Supp. 48 (D. Mass. 1994) (Ponsor, J.), claims of contract breach and statutory violation were held not to be preempted.  Id.  Judge Ponsor held that there was no need for the court "to probe the internal workings of defendant's plan" but simply had to "compare its components, viewed externally, with the competitor's offering."  Id. at 51.  In a zestful and colorful opinion, Judge Ponsor, holding preemption was not warranted, expressed the court's perspective on ERISA preemption of state claims.  Id. at 49-51 (describing ERISA's preemption provision as a "semantic gremlin" that "should be exiled from the terminology of the law . . .," explaining that "[i]n some cosmic sense, just about everything might be said to 'relate to' everything else," and noting that the matter before the court did not involve "activities at the heart of the administration of the benefit plan;" rather, "[t]he claim is simply that the plaintiff got snookered at the initial sale.").

Miara relies largely upon the recent decision in Giannetti

v. <u>Mahoney</u>, 218 F. Supp. 2d 8 (D. Mass. 2002) (Neiman, M.J.), an action against an insurance agent and agency involving misrepresentations in connection with a group disability insurance plan.  <u>Id.</u> at 9-10, 13; Pl.'s Mem. at 5.[32]  Magistrate Judge Neiman concluded that the claims were "run-of-the-mill misrepresentation claims" that did not "relate to" an ERISA plan, and remanded the case to state court.  <u>Giannetti</u>, 218 F. Supp. 2d at 13, 15.  In <u>Giannetti</u>, Magistrate Judge Neiman provided an overview of existing circuit case law, noting that "[a]t least five circuits, in opinions which this court finds convincing, have held that section 514 does <u>not</u> preempt claims <u>against insurance professionals</u> sued for <u>misrepresentations in procuring an ERISA policy or inducing policy participation</u>."  <u>Id.</u> at 14-15 (emphasis added) (referring to the Fourth, Fifth, Eighth, Tenth and Eleventh Circuits).  <u>Compare</u>  <u>Lion's Volunteer Blind Ind., Inc.</u> v. <u>Automated Group Admin., Inc.</u>, 195 F.3d 803 (6th Cir. 1999) (holding that since the claim required the court to calculate the benefits due to the beneficiary under the plan, that it sufficiently related to ERISA).  Magistrate Judge Neiman accordingly held that all of the claims were related to the defendants' alleged misrepresentations and were thus not

--------

[32] In <u>Giannetti</u>, the plaintiff's complaint set forth eleven state law causes of action (in response to an alleged breach of a promise to provide a policy based on certain income rather than on actual earnings).  <u>Giannetti</u>, 218 F. Supp. 2d at 10-11.

preempted.  <u>Giannetti</u>, 218 F. Supp. 2d at 13 (explaining that "each [claim] . . . targets Defendants' alleged misrepresentations in procuring the . . . policy. <u>Id.</u> at 10.).

In recent months, Judge Saris in <u>Children's Hosp. Corp.</u> v. <u>Kindercare Learning Ctrs.</u>, 360 F. Supp. 2d 202 (D. Mass. 2005) (Saris, J.), decided that state law claims[33] brought by a hospital against a self-insured employer and an administrator for misrepresentations regarding the scope of treatment coverage were not preempted by ERISA.[34]    Children's Hospital argued that a breach of "a duty owed to it by intentionally or negligently misrepresenting the existence of coverage," like Miara's situation, could not be brought as a claim under section 502. <u>Id.</u> at 206.  After reviewing the Supreme Court's decision in <u>Aetna Health Inc.</u> v. <u>Davila</u>, 542 U.S. 200 (2004) (reviewing removal to federal court in an ERISA context and enunciating a

---

[33] Paralleling Miara's claims, the state law claims in <u>Children's Hosp. Corp.</u> included causes of action for fraud, negligent misrepresentation, promissory estoppel, breach of contract, and a violation of Massachusetts General Laws Chapter 93A.  360 F. Supp. 2d at 203.

[34] Judge Saris cites <u>Home Health, Inc.</u> v. <u>Prudential Ins. Co. of Am.</u>, 101 F.3d 600, 604 (8th Cir. 1996), in which the Eighth Circuit observed that the precedent in most circuits is that state law misrepresentation claims brought by plan administrators or for by third-party health care providers are not preempted. <u>Children's Hosp. Corp.</u>, 360 F. Supp. 2d at 206. It stands to reason that if claims concerning misrepresentations made by plan administrators with fiduciary duties are not preempted, the claims here against non-fiduciary insurance agents, agencies or companies likewise ought not be preempted.

complete preemption analysis), the court stated that the case could be removed "only if (1) Children's Hospital could have brought any of its state-law claims under § 502, and (2) no other independent legal duty supports the claim(s)." <u>Children's Hosp. Corp.</u>, 360 F. Supp. 2d at 205. Judge Saris also decided that the contract claim[35] was not preempted as the contract allegedly breached "[did] not involve the ERISA plan, but an <u>independent contract between the two entities</u>." <u>Id.</u> at 206 (emphasis added). This Court considers the decisions[36] of Judges Skinner, Saris and

---

[35] Judge Saris took particular care to address the Chapter 93A claim. <u>Children's Hosp. Corp.</u>, 360 F. Supp. 2d at 207. Judge Saris indicated that an argument that the "obstruction of Mrs. Doe's payments by asserting that Kindercare would not accept her form of payment . . . is the rub because it appears to collaterally challenge the plan's decision not to provide benefits and the claim may affect the relationship between the participants and the principals." <u>Id.</u> (indicating that though this may appear to "trigger the conflict preemption analysis under § 514(a)," nevertheless, "conflict preemption is a defense to a state claim and does not create subject matter jurisdiction." <u>Id.</u> (citing <u>Danca</u>, 185 F.3d at 4-5)).

[36] The Court also directs attention to its own decision in <u>Andrews-Clarke</u>, 984 F. Supp. 49. Though that decision in no way drives the decision of this Court here, to apply preemption in this situation would lead this Court, as in <u>Andrews-Clarke</u>, to "throw" yet another potentially wronged individual "out of court." 984 F.Supp at 53 n.20. The consequences for Miara, given her reliance and the sale of her business based on the instructions she was given by Bonasera, would be devastating indeed. The "practical impact" of ERISA preemption would indeed "immunize" insurance agents and agencies from liability. <u>Id.</u> at 55. Unlike the outcome in <u>Andrews-Clarke</u>, where this Court was constrained to apply ERISA preemption, to apply it here appears to this Court an overly expansive reading of the phrase "relates to."

Ponsor and Magistrate Judge Neiman on point and persuasive.[37]

### (1) **District Court Decisions in the First Circuit and Elsewhere**

A decision from the District of Maine is particularly persuasive. <u>Stetson</u>, 16 F. Supp. 2d 28. <u>Stetson</u> involved the exact issue this Court decides here: "whether ERISA preempts state law claims against an insurer, an insurance agency, and an insurance agent stemming from misrepresentations made by the insurance agent (acting on behalf of the insurer) prior to the establishment of the employee benefit plan in question." <u>Id.</u> at 31. The analysis of applicable case law and the holding of the court in <u>Stetson</u> resonates with this Court: "[W]here liability is predicated upon events preceding in time the existence of the . .

---

[37] This Court has carefully considered additional District of Massachusetts cases. Though summarizing each case here might prove useful, in the interest in salvaging whatever brevity may still exist, the Court refers generally to <u>Utility Workers, Local 369</u> v. <u>NSTAR Elec. & Gas Corp.</u>, 317 F. Supp. 2d 69, 72 (D. Mass. 2004) (Harrington, J.) (holding, on facts distinguishable from this case, that the "state law breach of contract and misrepresentations claims" were preempted because "both relate to NSTAR's alleged representation that the plaintiffs' benefit plans would not change" after a merger of Boston Edison Co. and Commonwealth), <u>Tuohig</u> v. <u>Principal Ins. Group</u>, 134 F. Supp. 2d 148 (D. Mass. 2001) (Gorton, J.) (deciding preemption applies where spouse claimed emotional distress and unfair trade practices "arising out of" a denial of medical benefits), and <u>Spalding</u> v. <u>Reliance Standard Life Ins. Co.</u>, 835 F. Supp. 23 (D. Mass. 1993) (holding, in a matter distinguishable from Miara's case, that state law claims against an insurance company and an independent insurance broker for an employer were preempted by ERISA as such a matter arose out of a denial of benefits and improper processing of claims under an ERISA plan).

. ERISA plan, and where imposition of liability will have no

impact upon the ERISA plan or its administration, . . . [the

claims are not] sufficiently 'related to' the ERISA plan to

generate preemption." Id. at 35.  The court cited Judge Bownes's

concurring opinion in Golas, 106 F.3d at 4-9.  In Golas, Judge

Bownes articulated "eight reasons" for concluding preemption was

unwarranted:

> (1) No ERISA benefits are sought and no ERISA rights or
> obligations are asserted.  (2) Defendant . . .  would be
> personally responsible for any money damages awarded to
> plaintiff.  (3) Defendant . . .  is not an ERISA entity, nor
> does the alleged misrepresentation claim affect the
> relationship between ERISA entities.  (4) None of the three
> categories of state laws that Travelers holds Congress
> intended to pre-empt are implicated.  (5) The common-law
> claim of misrepresentation is a state law of general
> application.  Moreover, tort law in general is traditionally
> an area of state regulation.  It is therefore unlikely that
> Congress intended to intrude into this area by pre-emption.
> (6) Congress did not intend to shield tortfeasors from
> liability for misrepresentation where ERISA benefits,
> rights, obligations, and core concerns are not implicated.
> (7) State common law imposes a duty of care relative to
> representations made by insurance professionals which does
> not in any way depend upon ERISA.  (8) The alleged
> misrepresentation occurred prior to the time when the ERISA
> plan would have taken effect.

106 F.3d at 10 (Bownes, J. concurring); see also Metayer v. PFL

Life Ins. Co., No.CIV.A.98-177-P-C, 1999 WL 33117063 (D. Me. July

15, 1999) (unreported decision) (adopting the reasoning in

Stetson).

This Court is also persuaded by the decision of the District

of New Hampshire[38] in <u>Berlin City Ford, Inc.</u> v. <u>Roberts Planning Group</u>, 864 F. Supp. 292 (D.N.H. 1994) (identifying the issue in that case as "whether a plan administrator's state law professional negligence claims against a non-fiduciary 'relate to' an ERISA regulated plan within the meaning of 29 U.S.C. § 1144(a)" <u>Id.</u> at 295.).   In <u>Berlin City Ford</u>, the administrator of an ERISA-covered plan alleged that a non-fiduciary plan advisor provided inadequate and negligent assistance and guidance.   <u>Id.</u> at 293.   Though decided prior to the <u>Travelers</u> case, 514 U.S. 645, Judge Barbadoro approached the matter as if guided by the Supreme Court's narrowing iteration in <u>Travelers</u>, namely that "[i]n the final analysis, 'the question whether a certain state action is pre-empted by federal law is one of <u>congressional intent</u>.'" <u>Berlin City Ford</u>, 864 F. Supp. at 294 (quoting <u>Allis-Chalmers</u>

---

[38] The District of New Hampshire also addressed ERISA preemption in <u>Macomber</u> v. <u>Digital Equip. Corp.</u>, 865 F. Supp. 65, 71 (D.N.H. 1992) (ruling ERISA preemption for a claim regarding pre-plan misrepresentations made was proper).   865 F. Supp. at 71.   Judge McAuliffe indicated that he was persuaded, in making this 1994 decision, by the Eleventh Circuit decision in <u>Farlow</u>, 874 F.2d 791, and the Sixth Circuit decision in <u>Cromwell</u>, 944 F.2d 1272.   It is important to note, however, that Judge McAuliffe's decision preceded the Eleventh Circuit's 1996 en banc decision in <u>Morstein</u>, 93 F.3d 715 (11th Cir. 1996) (en banc), which overruled <u>Farlow</u>, 874 F.2d 791.   Furthermore, as explained in the discussion of Sixth Circuit law supra, this Court believes <u>Cromwell</u> to be distinguishable from the matter before this Court: Miara does not seek benefits under the plan, the suit is against a insurance agent and agency and not an employer.   Guided by the Supreme Court's decision in <u>Travelers</u>, 514 U.S. 645, a finding of preemption would run counter to the original purpose of, and Congressional intent when enacting, ERISA.

<u>Corp.</u> v. <u>Lueck</u>, 471 U.S. 202, 208 (1985) (discussing the parallel preemption provision found in section 301 of the Labor Management Relations Act)) (emphasis added).  The court held that, given

> the nature of the suit at issue . . . [the] state law
> negligence claims <u>do not arise from the administration of</u>
> <u>the plan</u> itself, <u>or the provision of any plan benefits</u>.
> Likewise the suit <u>does not involve parties whose</u>
> <u>relationships are governed by ERISA</u> such as relations among
> the plan's beneficiaries, administrators or fiduciaries.  In
> short, . . . [the] <u>state law claims have little or nothing</u>
> <u>to do with the operation of the plan itself</u>.  Accordingly .
> . . [the state law] claims . . . must be remanded to state
> court because they do not relate to an ERISA plan.

 <u>Id.</u> at 296 (emphasis added).

    One of the most recognized and relied upon decisions is the district court decision in <u>Greenblatt</u> v. <u>Budd Co.</u>, 666 F. Supp. 735 (E.D.Pa. 1987).  <u>Greenblatt</u> involved misrepresentations made by employers in their non-fiduciary capacity regarding available pension benefits "in the ordinary course of business".  <u>Id.</u> at 742.  The court held that:

> The cause of action for misrepresentation alleged by the
> plaintiff . . . should not be preempted because, simply put,
> the <u>premise underlying this action was that plaintiff was</u>
> <u>deceived by the verbal statements made</u> and the actions taken
> by his employer.  <u>That the subject of the deception concerned</u>
> <u>pension benefits is only incidental</u> and <u>not essential</u> to the
> plaintiff's cause of action.
> . . . .
>    . . . [T]he case law suggests and this Court is persuaded
> that the plaintiff would be without a remedy under ERISA.
> As such, <u>it would defy logic to presume that Congress</u>
> <u>intended to preempt the common law action</u> of fraud <u>in a</u>
> <u>situation of this type</u>.

Id. (citations omitted) (emphasis added).  The Court agrees with the Greenblatt characterization of the claims as applied to the case before it.  This Court's review of the decisions in Stetson, Berlin City Ford, and Greenblatt has informed its decision in this matter.[39]

(2)  **Precedent in the Commonwealth of Massachusetts and Other Jurisdictions**

This Court has also considered the decision of the Superior Court of Massachusetts in Trans-Lease Group, Inc. v. Spiegel, 7 Mass. L. Rptr. 330, 1997 WL 564366 (Mass. Super. Ct. Sept 2, 1997) (Cratsley, J.).  There, Justice Cratsley held, in a misrepresentation case against an insurance agent in which the plan in question no longer existed, that:

---

[39] Here too, this Court has weighed cases beyond those decisions cited and discussed in the text in forming its opinion. For example, this Court notes a decision from the District of Connecticut.  DiPietro-Kay Corp. v. Interactive Benefits Corp., 825 F. Supp. 459 (D.Conn. 1993) (involving an employer's state claims relating to misrepresentation and concealment).  In DiPietro, Judge Dorsey, while noting that "[l]egislative intent notwithstanding, the circuits are split as to whether ERISA preempts misrepresentation claims that arise from the sale of benefits plans," id. at 421, held that the state law claims were not preempted by ERISA.  Id. at 462 (focusing on the fact that "preemption of [the] misrepresentation claims by ERISA would not advance any of the purposes that preemption was designed to serve").  See also Moore v. Yellow Book USA, Inc., 343 F. Supp. 2d 539, 542, 545 (N.D. Miss. 2004) (holding state law claims for fraudulent misrepresentation of the scope of benefits were not preempted by ERISA); Massey v. Stanley-Bostich, Inc., 255 F. Supp. 2d 7, 13 (D.R.I. 2003) (holding breach of contract and promissory estoppel claims against plan administrator and former employer in connection with a retirement plan to be preempted).

74

> [e]ven if the Plan was still in existence, the plaintiff's
> claims relate to <u>alleged misrepresentations</u> made by the
> defendants and they <u>do not relate to the administration of
> the Plan</u> or to the <u>calculation of any benefits</u> under the
> Plan. The Plan is <u>incidental</u> to the plaintiff's claims . .
> . [and] any award against the defendants will not directly
> affect the administration of benefits under the Plan.

<u>Id.</u> at *3-4 (paragraph structure altered). The court in <u>Trans-
Lease</u> relied on the seminal Massachusetts Supreme Judicial Court
decision in <u>Pace</u> v. <u>Signal Tech. Corp.</u>, 417 Mass. 154, 159-60
(1994). <u>Pace</u> involved a suit brought against an employer by an
employee alleging that misrepresentations were made as to long-
term disability coverage. <u>Id.</u> at 154-155. Though decided prior
to the Supreme Court's decision in <u>Travelers</u>, 514 U.S. 645, the
Supreme Judicial Court presciently indicated that one must look
to the actual intent of Congress when enacting ERISA in order to
properly to determine preemption. <u>Pace</u>, 417 Mass. at 156.
Acknowledging the expanse of ERISA preemption, the Supreme
Judicial Court indicated in <u>Pace</u> that the claims there were too
remote to "relate to" the plan. <u>Id.</u> at 159-60 (citing, in
arriving at its decision, the decision in <u>Cuoco</u>, 722 F. Supp.
884). This Court likewise deems compelling the Massachusetts
state court decisions in <u>Trans-Lease</u> and <u>Pace</u>.

In <u>Holroyd</u> v. <u>Requa</u>, 361 S.C. 43 (S.C. Ct. App. 2004), it
was held that an insured's misrepresentation, fraud and
negligence claims against an insurance agent who provided
inadequate services and information were not preempted. <u>Id.</u> at

57.  In <u>Holroyd</u>, Justice Cureton held that:

> Like the malpractice claims in <u>Heaitley</u> and <u>Medical Park</u>,[40]
> these common law claims <u>do not impact</u>--even in a tenuous
> fashion--<u>employee benefit structures or their
> administration</u>, <u>bind employers or plan administrators to
> particular choices</u>, or <u>preclude uniform administrative
> practice</u>.

> Furthermore, [the] claims are <u>not aimed at obtaining
> ERISA benefits</u>.  Rather, the[] . . . action [was brought]
> <u>seeking damages proximately caused by</u> . . .
> <u>misrepresentations in marketing the [plan]</u> and [the]
> negligent failure to apprise [insureds] of the [p]lan's
> financial and regulatory difficulties. . . . [The <u>insurance
> professional] will be liable in his individual capacity for
> his negligence</u> . . . .

<u>Holroyd</u>, 361 S.C. at 57-58 (emphasis added).  Justice Cureton's

opinion is extremely convincing.[41]

The abiding precedent in the First Circuit, and the

---

[40] The Court of Appeals of South Carolina previously had
addressed ERISA preemption of state law claims.  <u>See</u> <u>id.</u> at 55-56
(citing <u>Heaitley v. Brittingham, Dial & Jeffcoat</u>, 320 S.C. 466,
460-70 (S.C. Ct. App. 1995) (finding no preemption in a suit
alleging misrepresentation and professional negligence by a widow
against deceased husband's business partnership for wrongfully
accepting life insurance premiums while he was still living), and
<u>Medical Park OB/GYN, P.A.</u> v. <u>Ragin</u>, 321 S.C. 139, 145 (S.C. Ct.
App. 1996) (finding preemption improper in light of the purpose
of ERISA in a suit alleging professional negligence, negligent
misrepresentation and breach of fiduciary duties by a doctor's
office in the formation of an ERISA plan)).

[41] This Court has also considered <u>Finn</u> v. <u>Nachreiner Boie Art
Factory</u>, 201 Wis.2d 549 (Wis. Ct. App. 1996) (holding state fraud
in the inducement and misrepresentation claims against insurance
agent and insurer preempted by ERISA) in arriving at its
decision.

decisions and rationale of other circuit courts[42], the District

of Massachusetts, and other jurisdictions lead this Court to

conclude that Miara's state claims, discussed individually infra,

are not to be preempted by ERISA.

**E.    Applying the Legal Framework to the Allegations in this Case -- Do Miara's State Law Claims "Relate To" an ERISA Protected Plan?**

Prior to addressing Miara's specific claims, there are a few

preliminary matters that this Court addresses.

**1.    General Considerations**

**a.  Need to Consult the Plan to Determine Damages**

Miara emphasizes that she "does not challenge <u>the plan</u>

_____

[42] The District of Columbia Circuit's interpretation comports with that of the other circuits.  Ruling ERISA preemption appropriate in a case involving a settlement agreement, the D.C. Circuit stated that "general common law causes of action, such as breach of contract, which were not specifically intended to apply to benefit plans covered by ERISA, will . . . be preempted <u>insofar [as] they affect ERISA-protected rights</u>."  <u>See</u> <u>Board of Trs. of Hotel and Rest. Employees Local 25</u> v. <u>The Madison Hotel, Inc.</u>, 97 F.3d 1479 (D.C. Cir. 1996) (citing <u>Boren</u> v. <u>N.L. Indus., Inc.</u>, 889 F.2d 1463, 1466 (5th Cir. 1989) for the proposition that "even if a state law does not expressly concern an employee benefit plan, it will still be preempted insofar as the law applies to a benefit plan in particular cases.") (emphasis added); <u>Shaffer</u> v. <u>Veneman</u>, 325 F.3d 370, 372 (D.C. Cir. 2003) (explaining that a settlement agreement directly involves rights under a benefits plan and noting that the settlement agreement in <u>Madison Hotel</u>, "almost inevitably require[d] construction and application of specific ERISA provisions which define the scope of . . . obligations and . . . legal entitlements . . . ." (emphasis added)).

itself[43] nor the administration of the plan.  Rather, she

challenges the 'procurement of the plan,' [and] that the

defendants should have known that spousal survivor benefits for

'substantial owners' were subject to substantial limitations but

failed, either deliberately or negligently, to disclose such

limitations."  Pl.'s Mem. at 4 (citing Giannetti, 218 F. Supp. 2d

at 12) (footnote added); See Tr. at 13.  As indicated in

Giannetti, the plan - procurement of the plan difference "is a

crucial distinction."  **218 F. Supp. 2d at 12.**  The focus of these

claims is on the promise, not on the plan.  Likewise, Miara's

"claims are not aimed at obtaining ERISA benefits."  Holroyd, 361

S.C. at 58.  Her action seeks "damages proximately caused" by the

Defendants sale of the plan and misrepresentations.  Id.

Further, the Defendants "will be liable in their individual

capacity for . . . negligence."  Id.  (emphasis added).  Miara

claims that Baker and Bonasera:

> repeatedly led [her] to believe that there were no . . .
> limitations, and that upon her death or upon the death of
> her husband, the surviving spouse was guaranteed by [Pension
> Benefit] to receive 100% spousal survivor benefits.  Even
> after the death of [her] husband, [First] Allmerica and
> Bonasera assured [her] that she was entitled to full spousal
> monthly benefits exceeding $2,000.  [Miara] and her husband
> purchased the plan specifically in reliance upon the
> representations by Baker and Bonasera that they were
> guaranteed to receive full spousal benefits if one or the
> other died.

---

[43] Since Miara does not challenge the plan, she accordingly,
and appropriately, has not included Pension Benefit, the
guarantor of the plan, as a party to this suit.

Pl.'s Mem. at 4.  Such assurances were apparently made both
orally and in writing.  See id.

    As Miara's attorney responded, when asked by this Court at
oral argument why the plan need not be consulted and how damages
could be considered to be already calculated:

> we've already got the determination by [Pension Benefit],
> the Pension Benefit Guaranty Corporation, that she's going
> to receive $541 a month beginning February of 2006.  That's
> what she's entitled to under the plan.  Now you've got
> Bonasera--or you've got First Allmerica's representation
> that she's going to get two thousand and four hundred and
> some dollars a month beginning in February 2006.  They've
> already made the determination for us, fortunately, so you
> don't have to refer to the plan.  Even if they hadn't done
> that calculation, your Honor suggested the alterative
> yourself by suggesting that its up to the fiduciary to
> determine what the damages would be. You don't have to refer
> to the plan.

Tr. at 13-14; see also id. at 6-7 (transcribing this Court's
hypothetical proposal: "suppose we just try the case.  If she
wins she gets a hundred percent of the spousal benefits under the
plan.  Just calculate it out, we'll defer to the plan fiduciaries
to figure out what the spousal benefits are and there are our
damages, we don't have to fool with the plan."); Pl.'s Mem. at 3
(stating that, First Allmerica informed Miara in an October 8,
1996 letter that she could collect, as Miara in fact opted,
$2,457.27 if she deferred her collection until February 1, 2002,
and, as referred to by Miara's counsel at oral argument, informed
her a January 6, 1997 letter that she could collect, once again

as Miara in fact opted, $2,664.35 if she deferred her collection until February 1, 2006).

This Court rules that given the written confirmations of promised benefits and the nature of Miara's claims, any reference to the plan to calculate damages, if such reference even need be made, would be remote and incidental.  See Morstein, 93 F.3d at 723-724 ("If ERISA preempts a beneficiary's potential cause of action for misrepresentation, employees, beneficiaries, and employers choosing among various plans will no longer be able to rely on the representations of the insurance agent regarding the terms of the plan.  These employees, whom Congress sought to protect, will find themselves unable to make informed choices regarding available benefit plans where state law places the duty on agents to deal honestly with applicants.").

b. **ERISA Entities or Relationships**

The Defendants here are not Miara's employers, see Carlo, 49 F.3d 790, or plan administrators.  Likewise, there exist no fiduciary duties between the Defendants and Miara.[44]  Compare

---

[44] Counsel for Baker attempted to argue at oral argument that: "I would . . . respectfully suggest that under ERISA the employer has actual obligations to . . . retirees under ERISA plans.  This is contrasted with my client, Baker, who [has] no obligation under ERISA.  So we have the ironic circumstance here that in the First Circuit it would appear that if the employer who [has] obligations makes a misrepresentation is preempted, but someone who has no obligations under an ERISA plan, no financial responsibility" are not preempted.  Tr. at 9-10.
This Court emphasized, and again emphasizes, the problem

Dudley, 302 F.3d at 4 (noting, unlike the matter sub judice, that in that case "it [wa]s clear that the gravamen of the complaint is . . . [a breach of] fiduciary duty under ERISA to provide competent investment advice and services rather than . . . [a violation of] run-of-the-mill state laws that are largely tangential to and not preempted by ERISA.") (internal quotations and footnote omitted).

    To hold that insurers may never be sued in connection with ERISA plans for misrepresentations made would grant de facto immunity to all insurers, or to any entity or anyone, in any way, shape or form involved with a plan, all at the expense of the employee.  See Cromwell, 944 F.2d at 1286 (Jones, J. dissenting) (warning that "perhaps inadvertently the majority has enabled plan administrators, either intentionally or not, to give misinformation of coverage and avoid any inquiry into the validity of . . . claims against them"); Berlin City Ford, 864 F.Supp at 296 (indicating that courts should not "construe ERISA to protect non-fiduciaries from state laws of general applicability that are intended to ensure that professional services are rendered with reasonable diligence").

---

with the current state of ERISA preemption, namely that "[p]reemption used to mean which forum would entertain the cause of action. In the strange world of ERISA, preemption is, as the cases refer to it, an act. It cuts off. Because Congress never thought of this. ERISA cuts off liability."  Tr. at 10.

### c.    **Timing of the Alleged Misrepresentations**

Several cases have addressed the "timing" of the misrepresentations made.  "The timing of plan formation is not the crucial factor in ERISA preemption." Hobson, 75 Fed.Appx. at 954.[45]  It is rather the extent to which a claim "relates to" ERISA that determines preemption.  Id.  This Court concludes that the existence of a "relationship . . . based on a plan governed by ERISA," Cuoco, 722 F. Supp. at 886-87, is more critical to the preemption determination than is the timing of the alleged misrepresentation.

### 2.    **Misrepresentation**

Miara contends her claims are "run-of-the-mill misrepresentation claims" that do not "relate to" an employee benefit plan and do not establish a basis for federal jurisdiction. Giannetti, 218 F. Supp. 2d at 13.  Miara relies on Giannetti and asserts that "[a]s in Giannetti, [her] claims are based on the defendants' misrepresentations . . . [and t]he claims do not and will not affect the plan itself and, accordingly, are not preempted by ERISA."  Pl.'s Mem. at 5; Giannetti, 218 F. Supp. 2d at 8.  She also relies on Industrial

---

[45] Indeed, the issue of timing is especially unimportant here as Miara alleges that the misrepresentations were made at the time the Miaras were discussing the procurement of the plan and continued in correspondence delineating the benefits Miara would receive after Mr. Miara's unfortunate accident.

<u>Tech.</u>, 866 F. Supp. 48 (Ponsor, J.) and argues that she was "<u>lured</u> into a <u>false sense of security about the contents of its benefit package</u> . . . [and that she was] <u>snookered at the initial sale.</u> <u>The plan itself was not what defendant represented it to be</u>." <u>Id.</u> at 50 (emphasis added). Further, relying on <u>Cuoco</u>, Miara argues, her claims "arise not from the deprivation of any rights under the . . . plan but <u>from the series of promises and misrepresentations which were allegedly made to her by defendants</u>." 722 F. Supp. at 886-887 (emphasis added).

The crux of the Defendants' argument in opposition to the motion to remand is that Miara's causes of action "relate to" an employee benefit plan, and, as such, the claims are preempted by section 514 of ERISA. Baker Opp'n at 3; Bonasera Opp'n at 2. Further, as in <u>Vartanian</u>, defendants here argue, the "claims [are] preempted by ERISA because 'the existence of the . . . plan is <u>inseparably connected</u> to any determination of liability under the state common law of misrepresentation.'" Bonasera Opp'n at 2 (citing <u>Vartanian</u>, 14 F.3d at 700) (emphasis added)(second alteration in the original); Baker Opp'n at 3-4. They further assert that the "terms of the plan and the money received by [Miara] pursuant to the plan are directly at issue in this case [as it] . . . involve[s] the calculation of the benefits" to be paid to the plaintiff and hence involves the administration of the plan.). Bonasera Opp'n at 3 (citing <u>Carlo</u>, 49 F.3d at 794).

The Defendants press upon this Court that "to make determinations regarding her alleged damages, the Court would be forced to refer to . . . the benefits as set-forth in the plan, the benefits she ultimately received, and the alleged misrepresentations of the defendants." Bonasera Opp'n at 3. Baker further argues, in support of the Defendants' argument, that as one need consult the plan to determine damages the claims "relate to" the plan, and that "the sole issue in dispute is whether [Miara's] claims for pension benefits payable under a Defined Benefits Plan should be based on the <u>figures provided</u> to the plaintiff in 1996 and in 1997 or on <u>figures provided</u> to the plaintiff in 2002." Baker Opp'n at 6 (emphasis added). Not only does this seem a mischaracterization of the issue, but it fits incongruous with the Defendants' argument, as it conceivably lends support for Miara's position that the figures provided to her in the correspondence are all one need consult. See Tr. at 13-14 ("[W]e've already got the determination by [Pension Benefit] . . . that she's going to receive $541 a month beginning February of 2006. Now you've got Bonasera--or you've got First Allmerica's representation that she's going to get two thousand and four hundred and some dollars a month beginning in February 2006. They've already made the determination for us, fortunately, so you don't have to refer to the plan."). Miara's argument has greater merit.

Miara's misrepresentation claim should not be preempted. It is useful to consider, as only one example, the seven factors considered by the Eighth Circuit as articulated in <u>Wilson</u>.[46]  114 F.3d at 717. These factors reflect the purpose of ERISA in an instructive and succinct application of existing case law in this circuit. In the case <u>sub judice</u>, Miara does not seek ERISA benefits, seek to negate an ERISA provision, or assert rights under ERISA. The Defendants are not ERISA entities,[47] nor does there exist a relationship between ERISA entities. <u>See</u> <u>Coyne</u>, 98 F.3d at 1469 ("Congress did not intend to preempt traditional state-based laws of general applicability that do not implicate the relations among the traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries.") (citation, internal alterations and internal quotation marks omitted). The state

---

[46] The District Court of Maine, in <u>Stetson</u>, outlined the Eighth Circuit's "multi-factorial test" in determining whether state claims are preempted. 16 F. Supp. 2d at 33 (citing and discussing the test as articulated by the Eighth Circuit in <u>Wilson</u>, 114 F.3d at 713. Though the First Circuit has never adopted this test, this Court considers its factors likewise relevant as they pertain to the general purposes of ERISA. <u>See</u> <u>Fort Halifax</u>, 482 U.S. at 8 (indicating that Congressional intent in enacting ERISA is the "ultimate touchstone" in the preemption determination).
Miara's claims would also pass muster under the Sixth Circuit's test in <u>Firestone Tire</u>, falling under the "remote and peripheral" exception to ERISA preemption. <u>Firestone</u>, 810 F.2d at 554.

[47] Indeed, Miara does not even bring suit against the ERISA entity.

claims do not impact plan structure or administration and there is no economic effect on a plan.  <u>Travelers</u>, 514 U.S. at 662 (explaining that laws with only an indirect economic effect on the relative costs of various health insurance packages in a given State are a far cry from those "conflicting directives" from which Congress meant to insulate ERISA plans).  Any money damages awarded would not affect an ERISA plan but would be the responsibility of the defendants.  The claims Miara raises, including misrepresentation and breach of contract, are traditional state claims.  More importantly, they cannot be considered the type of claims that Congress intended to preempt in enacting the ERISA statute.

"None of the three categories of state laws that <u>Travelers</u> holds Congress intended to pre-empt are implicated."  <u>Golas</u>, 106 F.3d at 10; see <u>Travelers</u>, 514 U.S. at 646 (identifying three areas Congress intended to preempt: (1) "state laws that mandate[ ] employee benefit structures or their administration," <u>id.</u> at 658-59, (2) "state laws providing alternative enforcement mechanisms," <u>id.</u> at 658, and (3) state laws that bind plan administrators to a "particular choice and thus function as a regulation of an ERISA plan itself" <u>id.</u> at 659.).  It is hard to imagine, in earnest, that Congress intended to preempt such a broad, historic, and traditional area of state law.

### 3.  Promissory Estoppel

Miara's claims include a promissory estoppel claim.  <u>See</u>
<u>Treadwell</u> v. <u>John Hancock Mut. Life Ins. Co</u>, 666 F. Supp. 278,
286 (D. Mass 1987) (Caffrey, J.) (ruling promissory estoppel
claims are allowed in Massachusetts).  Miara alleges that "Baker
and Bonasera made promises that they reasonably should have
expected to induce action," and that in fact did, she alleges,
"induce[]. . . such action" on the part of Miara.  Pl.'s First
Am. Compl. ¶¶ 24-25.  Miara claims that her reliance on these
promises and the breach of such promises caused her harm.  <u>Id.</u> ¶¶
26-27.

"[T]he Supreme Judicial Court eschewed the term 'promissory
estoppel,' stating that promises enforceable by virtue of
reliance would be treated as 'contracts' pursuant to traditional
contract theory." <u>Treadwell</u>, 666 F. Supp. at 286-87 (quoting
<u>Loranger Constr. Corp.</u> v. <u>E.F. Hauserman, Co.</u>, 376 Mass. 757, 761
(1978)); <u>see also</u> <u>McAndrew</u> v. <u>School Comm. of Cambridge</u>, 20 Mass.
App. 356, 363-64 & n.11 (1985) (explaining this theory in terms
of section 90(1) of the Restatement (Second) of Contracts to
detail the elements of this contractual theory, namely that "[a]
promise which the promissor should reasonably expect to induce
action or forbearance on the part of the promisee or a third
person and which does induce such action or forbearance is
binding if injustice can be avoided only by enforcement of the
promise.").

In <u>Cromwell</u>, the Sixth Circuit held that ERISA preempted a promissory estoppel claim.  <u>See</u> 944 F.2d at 1275.  This Court, however, considers the dissenting opinion of Judge Jones the more persuasive of the opinions in <u>Cromwell</u>.  944 F.2d at 1279-86 (noting the "overzealous readiness in the federal courts to bar all state-law claims," <u>id.</u> at 1279 (Jones, J. dissenting)).  Moreover, the Eleventh Circuit in <u>Morstein</u> indicated that "[w]hen a state law claim involves the reliance on an insurer's promise that . . . particular [coverage is provided] under a policy . . . a claim of promissory estoppel is not 'related to' the benefits plan."  <u>Morstein</u>, 93 F.3d at 723 (citation omitted).

This Court does not reach the merits of Miara's promissory estoppel claim but rules it is possible to determine the merits of the claim without reviewing the plan itself.  Miara alleges that she relied on misrepresentations that were repeatedly made, including representations that the plan included full spousal benefits, that she would have to sell (and did sell) her business in order to receive benefits, and subsequent representations via correspondence as to the amount of benefits she would receive.  The allegations do not sufficiently "relate to" the ERISA plan so as to preempt Miara's promissory estoppel claim.

### 4.  Malpractice

Miara argues that "defendants owed [her] a duty of care . . . to exercise reasonable skill, care and diligence in procuring

an appropriate retirement and pension plan" which duty they

"failed to exercise" as would those "ordinarily employed by

members of their profession."  Pl.'s First Am. Compl. ¶¶ 39-40.

Indeed, in this instance, state common law would, with respect to

the malpractice claim for example, "impose[] a duty of care

relative to representations made by insurance professionals which

does not in any way depend upon ERISA."  <u>Golas</u>, 106 F.3d at 10.

In <u>Dudley</u>, the First Circuit addressed[48] the preemption of

professional malpractice claims.

> We have examined the many cases . . . [which indicate] that
> claims based essentially on professional malpractice are <u>not
> preempted</u> by ERISA even though the claims involve in some
> way a plan governed by ERISA.  <u>These cases</u> . . . indicate
> that the malpractice claims <u>against</u> . . . [those] who were
> <u>not fiduciaries</u> with respect to an ERISA plan, <u>were not
> preempted.</u>

302 F.3d at 4-5 (citing <u>Berlin City Ford</u>, 864 F. Supp. at 295)

(internal quotations omitted) (emphasis added).  More

convincingly,  here there are no fiduciary obligations.

The Fourth Circuit in <u>Coyne</u> addressed specifically the

preemption of a professional malpractice claim.

---

[48] This Court, in <u>Andrews-Clarke</u>, also addressed preemption
in a malpractice context, and held a professional malpractice
claim was preempted by ERISA. 984 F. Supp. at 54 n.23.  That
matter is distinguishable, however, as it was a medical
malpractice claim involving the medical decisions made in
determining the availability of benefits under a plan.  Such
claims would "relate to" an ERISA-covered plan and, as such,
warrant preemption.

> There is no question that [the state] . . . claim is rooted
> in a field of traditional state regulation.  Common law
> professional malpractice, . . . has historically been a
> state concern.  Moreover, a <u>common law professional
> malpractice claim is a generally applicable law that makes
> no reference to, or functions irrespective of, the existence
> of an ERISA plan</u>.  The state law at issue in this case
> imposes a <u>duty of care on all professionals</u>, including all
> insurance professionals.  <u>Common law imposes the duty of
> care regardless of whether the malpractice involves an ERISA
> plan or a run-of-the-mill automobile insurance policy</u>.
> <u>Thus, the duty of care does not depend on ERISA in any way</u>.
> Finally, the state law malpractice claim <u>does not affect
> relations among the principal ERISA entities</u>. . . . [The]
> claim is asserted . . . against the [insurers] . . . in
> their capacities as insurance professionals, not in their
> capacities as ERISA fiduciaries.

98 F.3d at 1471 (emphasis added)(internal citations, alterations,

quotations omitted) (involving insurers who later became ERISA

fiduciaries).  In considering Miara's claim, "the court's inquiry

will be centered on whether the defendants' conduct comported

with the relevant professional standard of care."  <u>Coyne</u>, 98 F.3d

at 1472.  The Court does not reach the merits of the claim but

rules that Miara's malpractice claim is not "related to" the

ERISA plan.  <u>See</u> <u>Painters</u>, 879 F.2d at 1152-53 (indicating

argument for preemption of a state law professional malpractice

case was preempted by ERISA was unpersuasive) ("[I]n the absence

of an explicit corresponding provision in ERISA allowing a

professional malpractice cause of action, Congress did not intend

to preempt a whole panoply of state law in this area. Thus, we

conclude that ERISA does not generally preempt state professional

malpractice actions." <u>Id.</u> at 1157 n.7.).  Such preemption would

be improper.

### 5.   Breach of Contract

Contract law "is the very bedrock of our notion of
individual autonomy and property rights.  It was among the first
precepts of the common law to be recognized in the courts of the
Commonwealth and has been zealously guarded by the state
judiciary from that day to this."  Andrews-Clarke, 984 F. Supp.
at 53 (footnote omitted).  While Congress indeed intended to
preempt certain areas of law when enacting ERISA, preemption of
deeply-rooted state claims is only proper if the intention is
"clear and manifest."  See Travelers, 514 U.S. at 655 ("[W]here
federal law is said to bar state action in fields of traditional
state regulation we have worked on the 'assumption that the
historic police powers of the States were not to be superseded by
the Federal Act unless that was the clear and manifest purpose of
Congress.'" (quoting Rice v. Santa Fe Elevator Corp., 331 U.S.
218, 230 (1947)(emphasis added)).

Miara is not suing for a breach of the plan, which plan
could also be viewed as a contract under state law.  See Socia,
16 F. Supp. 2d at 70 (deciding preemption appropriate when state
law claim sought to enforce the "contractual terms of an ERISA
plan").  Rather, Miara is suing an insurance agent and company
for a breach of their agreement to recommend to the Miaras a plan
with full spousal survivor benefits.  Her claims are not for the

91

enforcement or interpretation of plan terms, Hobson, 75 Fed.Appx. at 952 (finding breach of contract claim preempted because the claim required interpretation of a policy), or against an employer or administrator for failure to provide her the terms provided in a plan.  See Hampers, 202 F.3d at 53 (explaining that the defendant in Hampers was "acting in its capacity as an ERISA employer and fiduciary with responsibility over the administration of the plan" and, unlike here, was "an ERISA employer with direct control over the administration and operation" of the employee benefit plan).  Id.  Nor does Miara seek "inclusion in [a plan]" as a remedy.  Hampers, 202 F.3d at 52.

A contract must be interpreted "with reference to the situation of the parties when they made it and to the objects sought to be accomplished."  Shea v. Bay State Gas Co., 383 Mass. 218, 222-23 (quoting Bryne v. Gloucester, 297 Mass 156, 158 (1937) (internal quotations omitted); see Tory A. Weigand, The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts, 88 Mass. L. Rev. 174, 178 (2004) (noting that contract construction should promote "justice, common sense and the probable intention of the parties") (alteration omitted). Miara's claims are against an insurance provider who allegedly misrepresented and failed to provide the type of plan Miara

desired.[49]  Accordingly, her claims are outside the scope of the provisions of ERISA.

### 6.  Breach of Guaranty

Miara alleges in her complaint that the "Defendants' conduct, including their guaranties that [p]laintiff would receive full spousal benefits under the plan and their failure to provide a plan that did in fact guarantee such payments constitutes a breach of guaranty."  Pl.'s First Am. Compl. ¶ 47. A "guaranty" is defined as "[a] promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance."  Black's Law Dictionary 724 (8th ed. 2004).  On the record before this Court, there is insufficient evidence to determine whether an actual guaranty was made not by Pension Benefits but by the Defendants to "answer for the . . . performance of some duty, in case of the failure of another who is liable in the first instance," in other words, to show that the Defendants promised to pay Miara full spousal benefits if no such benefits are paid under the plan.[50]  Though this Court expresses doubt as to the viability of this claim, the inquiry into the existence of a

---

[49] The Miaras might even be viewed as "employers" rather than employees in their negotiation of the terms with the insurance company.

[50] To the contrary, any guaranties made were made by Pension Benefit, a non-party.

guaranty and any related breaches are the proper province of the Massachusetts courts, as the claim does not sufficiently "relate to" the plan so as to warrant preemption or grant this Court jurisdiction.

### 7. Breach of the Covenant of Good Faith and Fair Dealing

This Court has recently had occasion to consider the Covenant of Good Faith and Fair Dealing. <u>Christensen</u> v. <u>Town of Kingston</u>, 360 F. Supp. 2d 212, 225-230 (D. Mass. 2005). Unlike a guaranty, any obligations under the covenant arise out of an "implied promise."[51] <u>See</u> <u>Wood</u> v. <u>Lucy, Lady Duff-Gordon</u>, 222 N.Y. 88 (1917) (Cardozo, J.); Weigand at 175. Justice Cardozo expressed the meaning of this implied promise: "A promise may be lacking and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed." <u>Wood</u>, 222 N.Y. at 91. This "belief that contracts can be 'instinct with obligation,' comprised the foundation for the recognition of an obligation of 'good faith' in a variety of transactions." Weigand at 176 (explaining that in Massachusetts, the 1919 case <u>Eaton</u> v. <u>Eaton</u>, 233 Mass. 351, 376 (1919), first indicated the "equity in the interest of good faith and fair dealing" and that <u>Eaton</u> and other decisions demonstrate the "equitable doctrines engrafted on

---

[51] For an extensive overview of the covenant of good faith and fair dealing in Massachusetts, see Weigand at 174-196.

written instruments silent upon the subject because consonant with fundamental ethical rules of right and wrong").

The covenant of good faith and fair dealing provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001) (quoting Druker v. Roland Wm. Jutras Assoc., 370 Mass 383, 348 (1976)(internal quotations omitted). The covenant has been described as "an indispensable measure of contractual morality." Rooney v. Weeks, 290 Mass 18, 27 (1935); see Weigand at 174.  In Gleason v. Smith, the Supreme Judicial Court stated "there is read into the contract the rule that, that which the law says a party ought to be satisfied with, the law will say he is satisfied with." 63 Mass. 484, 486 (1852).  If the Miaras were promised full spousal benefits, it seems the "contractually moral" thing to do is to ensure they receive what they expected, were promised, and "ought be satisfied with," and to require the Defendants to live up to their end of the bargain. Id.  Yet, isn't this breach of covenant claim, both in this case and in general practice, an attempt to take another bite at the apple when a breach of contract claim is actually the appropriate remedy? Christensen, 360 F. Supp. 2d at 228-229 (noting claims for breach of contract and claims for breach of the implied covenant of good faith and fair dealing ought not

95

become "automatic bedfellows").

Nevertheless, this Court expresses no opinion in deciding this motion to remand on the merits of Miara's breach of covenant claim.  The only question this Court must answer is whether the breach of covenant claim sufficiently "relates to" the plan so as to be preempted.  This Court answers the question in the negative. Any reference to the plan is purely tangential.

### 8.   Massachusetts General Laws Chapter 93A

Miara alleges that the Defendants, who are engaged in trade and commerce in Massachusetts, "intentionally and willfully" committed unfair or deceptive trade practices in violation of chapter 93A of the Massachusetts General Laws.  Pl.'s First Am. Compl. ¶¶ 51-54.  It may be true that "the possibility of providing remedies for double and treble damages under chapter 93A directly undermines the remedies expressly provided by Congress for denial of benefits claims under section 1132(a)(1)(B)."  Spalding, 835 F. Supp. at 30.  Yet, unlike Spalding, Miara's claims are not related to the denial of benefits under a plan.  See id.; compare Andrews-Clarke v. Lucent Tech., Inc., 157 F. Supp. 2d 93, 104 (D. Mass. 2001) (holding claims were preempted because they depended directly upon the employee benefit plan).

The Supreme Court has stated that "[t]he six carefully

integrated civil enforcement provisions found in § 502(a) of the
statute . . . provide strong evidence that Congress did <u>not</u>
intend to authorize other remedies that it simply forgot to
incorporate expressly." <u>Massachusetts Mut. Life Ins. Co.</u> v.
<u>Russell</u>, 473 U.S. 134, 146 (1985). It is true that where ERISA
appropriately preempts a plaintiff's claims, chapter 93A relief
would likely constitute "alternative forms of relief." <u>Paul
Revere Life Ins. Co.</u> v. <u>Payne</u>, No.CIV.A.94-2575, 2000 WL 424499
at *6 (Mass. Super. Ct. Mar. 17, 2000) (Fecteau, J.) (citing <u>Best</u>
v. <u>AGFA Compugraphic</u>, No.CIV.A.91-13406-Z, 1992 WL 390713 at *2
(D. Mass. Dec. 9, 1992) (Zobel, J.) (unreported decision), and
noting that applying chapter 93A "would likely create precisely
the type of individualized, potentially conflicting local
analysis and regulation that ERISA was designed to eliminate").
Here, however, the plan simply does not relate to the alleged
unfair trade practices by the Defendants. <u>See</u> <u>Cuoco</u>, 722 F.
Supp. at 887 (chapter 93A claim did not relate to an ERISA-
governed plan and was not preempted); <u>Framingham Union Hosp.</u>, 721
F. Supp. at 1490 (same). As Judge Saris succinctly stated,
conflict preemption is a <u>defense only</u> to a state action and does
not grant the federal court jurisdiction as would complete
preemption. <u>Children's Hosp. Corp.</u>, 360 F. Supp. 2d at 207
("[C]onflict preemption is a <u>defense</u> to a state claim and <u>does
not create subject matter jurisdiction</u>." (emphasis added)).

Preemption of the chapter 93A claim is inappropriate.

**F.  Remand Would Promote the Goals of ERISA.**

Preemption in this case would not promote the purposes of ERISA.  Rather, remanding this matter will promote ERISA's goals of protecting employee interests in benefit plans.  Despite the Defendants' urgings to the contrary, remand would not have an affect on the plan nor on the ability of plans and sponsors to rely on a uniform body of benefits law, nor will it negatively impact the ability of employers, employees, and beneficiaries to rely on the terms of benefits plans.  Considered in light of all of the case law ruminated by this Court:

- Benefits law is not involved; rather, this matter involves alleged misrepresentations made by an insurance agent and company in the sale of a plan.

- "[N]one of these state-law categories are implicated here."  Golas, at 106 F.3d at 7 (Bownes, J., concurring).

- "The damages claimed" here are not "dependent . . . on analysis of a qualified ERISA plan."  Carlo, 49 F.3d at 795.

- Miara does not seek "benefits under the" plan.  Holroyd, 361 S.C. at 56-57; Cromwell, 944 F.2d at 1285 (Jones, J. dissenting).

- Miara does not allege she is "entitled to participate in the [plan]" or want Defendants to "enroll" her in a plan.  Hampers, 202 F.3d at 52; Trans-Lease Group, 1997 WL 564366, at *4; Andrews-Clarke, 984 F. Supp. at 55.

- Miara does not want to "enforce" or "clarify" any rights under the plan. <u>Hampers</u>, 202 F.3d at 52; <u>Andrews-Clarke</u>, 984 F. Supp. at 55.

- The terms of the plan are not at issue or challenged[52] nor is an employer or administrator of a plan being sued "for what is in essence a plan administrator's refusal to pay allegedly promised benefits." <u>Turner</u>, 127 F.3d at 199.

- One need not evaluate or interpret the terms of the plan or Miara's rights under the plan to determine whether Defendant's misrepresented the policy to Miara. <u>Trans-Lease Group</u>, 1997 WL 564366, at *3 (holding that "[a]llowing . . . claims in state court would not require interpretation of the terms of the ERISA plan.").

- "[N]one of the underlying purposes of ERISA preemption is served by application of the [preemption] doctrine." <u>Stetson</u>, 16 F. Supp. 2d at 35.

"An unfortunate consequence of ERISA preemption is . . . that plan beneficiaries or participants who bring certain kinds of state actions . . . may be left without a meaningful remedy." <u>Turner</u>, 953 F. Supp. at 424.  After careful consideration, this Court determines that the "broadly sweeping arm" of ERISA does not grasp Miara's state claims.  <u>Id.</u>  It is important "to ensure that valid claims by deserving parties are not summarily dismissed with broad strokes by essentially presuming preemption of any claim vaguely connected to an employee benefits plan." <u>Cromwell</u>, 944 F.2d at 1286 (Jones, J. dissenting).

―――――――――――――――――

[52] What Miara seeks is recovery upon an an "independent contract" or relationship with the Defendants, <u>Children's Hosp. Corp.</u>, 360 F. Supp. 2d at 206, and is "independent of any coverage under the plan."  <u>Cromwell</u>, 944 F.2d at 1285 (Jones, J. dissenting).

This Court, in line with the decisions of Magistrate Judge Neiman and Judges Skinner and Ponsor, First Circuit dicta, the decisions of the Second, Third, Fourth, Fifth, Eighth, Ninth, Tenth and Eleventh Circuits, and, most importantly, the precedent of the highest court of our land, concludes that Miara's state claims against the Defendants involve the plan in "too tenuous, remote or peripheral a manner" and do not "relate to" an employee benefit plan. The persuasive language Stetson reverberates:

> Thus, if the congressional intent spurring the enactment of ERISA was to provide protection for the interests of participants and beneficiaries of employee benefit plans, it is difficult to view such a purpose as being fostered or furthered by preemption of state law claims by participants or beneficiaries targeting misconduct by an insurer and its agents that occurred prior to the establishment of the employee benefit plan, when the action has no demonstrable effect on the administration, structure, or fiscal well-being of the plan. The Court, therefore, concludes that no congressional purpose is served by preemption of [Miara's] claims.

16 F. Supp. 2d at 35. This Court is in unmitigated agreement. A cursory and uncritical reference to a plan that is not at all in dispute or at issue cannot be said to pull all of Miara's state claims under the "long shadow" of ERISA preemption. McCoy, 950 F.2d at 17; Stetson, 16 F. Supp. 2d at 35 ("No provisions of the plan are in dispute, and although resolution of the . . . claims may require reference to the terms of the . . . policy, the claims do not impact upon the administration or interpretation of the policy."). As such, preemption would be improper. "Quite

clearly, there must be a point beyond which ERISA was not designed to reach." <u>Crespo</u>, 780 F. Supp. at 875 (quoting <u>Totton</u> v. <u>New York Life Ins. Co.</u>, 685 F.Supp 27, 30 (D.Conn. 1987))(internal quotations omitted). This is precisely one of those points. A ruling that ERISA does not preempt the state claims does not threaten the goals of ERISA.

## II. Certification to the First Circuit Court of Appeals Pursuant to 28 U.S.C. § 1292(b).

At oral argument, counsel for defendant Baker, acknowledging both the lack of appeal if this Court remands the case to state court and the existing confusion within this circuit regarding the preemption of traditional state law claims, pleaded:

> There is no appeal. . . . and that's the problem with the case, that we have to try to figure out a way to get around it. Because I submit . . . that <u>it would be very much in the interests of all of us involved in this kind of work to get an answer by the First Circuit to the question whether these kind[s] of misrepresentation[] claims are preempted or not</u>.

Tr. at 11. Baker's counsel suggested to this Court that it certify this matter to the First Circuit, pursuant to 28 U.S.C. § 1292(b) (2005), for resolution and guidance. Section 1292(b) provides, in pertinent part, that:

> [w]hen a district judge, in making in a civil action an order not otherwise appealable . . . shall be of the opinion that such order involves a <u>controlling question of law</u> as to which there is <u>substantial ground for difference of opinion</u> and that an immediate appeal from the order may <u>materially advance the ultimate termination of the litigation</u>, he shall

101

so state in writing in such order.  The Court of Appeals
which would have jurisdiction of an appeal of such action
may thereupon, in its discretion, permit an appeal to be
taken from such order, if application is made to it within
ten days after the entry of the order.

28 U.S.C. § 1292(b).  The First Circuit has explained that

[o]nly rare cases[53] will qualify for the statutory anodyne;
indeed, it is apodictic in this circuit that interlocutory
certification of this sort 'should be used sparingly and
only in exceptional circumstances, and where the proposed
intermediate appeal presents one or more difficult and
pivotal questions of law not settled by controlling
authority.

---

[53] This Court appreciates that section 1292(b) certification
"should be used sparingly and only in exceptional circumstances."
Stone ex. rel. Estate of Stone v. Frontier Airlines, Inc., 256 F.
Supp. 2d 28, 47 (D. Mass. 2002) (denying Section 1292(b)
certification); Fierro v. I.N.S., 81 F. Supp. 2d 167 (D. Mass.
1999) (certifying under section 1292(b) in the interest of
judicial economy and efficiency primarily because, there, the
matter properly should have been brought before the Court of
Appeals in the first place).
    Certain instances, however, warrant section 1292(b)
certification.  See Canty v. Old Rochester Reg'l Sch. Dist., 54
F. Supp. 2d 66, 77 (D. Mass. 1999) ("The stark division among the
six circuits to consider Title IX preclusion of section 1983
actions certainly demonstrates sufficient difference of
opinion."); Stark v. Advanced Magnetics, Inc., 894 F. Supp. 555,
560 (D. Mass. 1995), rev'd on other grounds 119 F.3d 1551 (Fed.
Cir. 1997), (certifying matter to Federal Circuit in case
involving a controlling legal question as to which there was
marked room for varying opinion where ultimate termination of the
suit was advanced, and where substantial costs and resources
would have been saved by confirmation of this Court's analysis);
Cabral v. Sullivan, 757 F. Supp. 107 (D. Mass. 1991) (allowing,
where the Court had granted a new trial, opportunity for
interlocutory appeal where appeal was unavailable, as a new trial
which could result in waste of resources and energy); Pahlandjian
v. Pahlavi, 614 F. Supp. 1569, 1577 (D. Mass. 1985) (allowing
section 1292(b) certification to ensure uniform treatment in
parallel lawsuits).

<u>In re San Juan Dupont Plaza Hotel Fire Litig.</u>, 859 F.2d 1007, 1010 n.1 (1st Cir. 1988) (quoting <u>McGillicuddy</u> v. <u>Clements</u>, 746 F.2d 76, 76 n.1 (1st Cir. 1984)) (footnote added).

It is true that based on First Circuit precedent and the language of section 1292(b), "the instances where section 1292(b) may appropriately be utilized will, realistically, be few and far between." <u>San Juan Dupont</u>, 859 F.2d at 1010 n.1. Nevertheless Baker's counsel has argued, rather compellingly, that under section 1292(b) this Court ought certify the controlling question to the First Circuit for resolution. Tr. at 11. Yet consider, does this matter "involve[] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from [this] order may materially advance the ultimate termination of the litigation"? 28 U.S.C. § 1292(b).

The matter here is "sufficiently . . . important," <u>San Juan Dupont</u>, 859 F.2d at 1010 n.1, "constitutes an open question[,] and . . . the litigation would benefit from prompt resolution of th[e] question." <u>Camacho</u> v. <u>Puerto Rico Ports Auth.</u>, 369 F.3d 570, 573 (1st Cir. 2004). The Court here may be "fairly described as grappling with 'an important and unsettled question of controlling law.'" <u>In re Bank of New England Corp.</u>, 218 B.R. at 643, 652 (1st Cir. BAP 1998)(quoting <u>United States</u> v. <u>Sorren</u>, 605 F.2d 1211, 1213 (1st Cir. 1979)). The case law relied upon

103

in this Court's opinion indicates the existence of a "substantial ground for difference of opinion." 28 U.S.C. § 1292(b); Camacho, 369 F.3d at 573. Further, this litigation would certainly "benefit from prompt resolution" of this unsettled question, as Miara's claims will survive or, in effect, be terminated and leave her without recourse.

True, this Court has concluded that the state claims do not sufficiently "relate to" an ERISA-governed plan to warrant preemption. Moreover, this outcome, based on legal precedent in this circuit and in other circuits, seems apparent to this Court.[54] Nevertheless, the rationale of this court serves as persuasive authority only, and, as Baker's counsel indicated, binding direction from the First Circuit would clarify and put to rest the existing and abiding confusion in this circuit in this area of law.

This Court indicated its position during the parties' oral argument, and reiterates here, that it is "always eager to have . . . the district court['s] work[] validated or corrected by a higher court." Tr. at 12; see Stark, 894 F. Supp. at 560 ("Given th[e] equivocal outcome and faced by an impending series of extraordinarily complex and costly expert depositions, all

---

[54] In the prudence of Cecily, when this Court sees a spade, it calls it a spade. Oscar Wilde, The Importance of Being Earnest.

parties urge this Court to certify the accuracy of its . . .

analysis to the Federal Circuit for definitive resolution

pursuant to 28 U.S.C.[] § 1292(b).  This Court readily

agrees.").[55]  This Court awaits, as do the members of the bar

practicing in this area, a definitive decision from the First

Circuit to put to rest any confusion in this area once and for

all.[56]

There is, however, the question of the delay certification

will cause Miara's timely resolution of her state claims.  While

this Court does not "want to delay the case," Tr. at 12,[57] and

---

[55] Stark is an example of the value of the section 1292(b)
certification or interlocutory appeal.  894 F. Supp. at 560.
There, the Federal Circuit, accepting the interlocutory appeal
pursuant to this Court's section 1292(b) certification, Stark v.
Advanced Magnetics, Inc., 79 F.3d 1165 (Fed. Cir. 1996), reversed
this Court's ruling.  Stark v. Advanced Magnetics, Inc., 119 F.3d
1551 (Fed. Cir. 1997) (determining this Court's reading of the
patent law allowing for correction of inventorship was "too
restrictive," id. at 1556.).

[56] See Stark, 79 F.3d 1165 (considering as a factor in
exercising its discretion whether the district court desires
review).

[57] The careful reader will note that this opinion is
sprinkled with references to the transcript of the oral argument
on the motion to remand, eight to be exact.  Ready reference to
the transcript of such arguments has been of inestimable value in
the preparation of this and other judicial opinions.
    The Court here acknowledges the enormous contribution made
by the official United States Court Reporter assigned to this
session, Mr. Donald Womack, to its substantive legal work.  As
an example of his superb professionalism, Mr. Womack prepares
real time transcripts of all such arguments and provides them
electronically (absent court order and without any transcript
order having been placed by counsel) in full text searchable
format to this court and its law clerks on a publically available

website.  His innovation and devotion to the public good are
unexcelled and exemplify the finest traditions of our dedicated
United States Court Reporters, a public-private partnership that
fuels the many of the most important technological advances
within the federal judiciary.

It is actually being bruited that, notwithstanding the
controlling statute, 28 U.S.C. § 753 (1996), budget difficulties
may well deprive federal judges of court reporters altogether in
favor of cheaper tape recorders.  See Remarks of the Hon. John
Lungstrom, Chair of the Court Administration and Case Management
Committee of the Judicial Conference at the Annual Meeting of
District Court Chief Judges, Washington, April 14, 2005.

If the federal judiciary is actually contemplating
abandoning the benefits of daily copy, real time reporting, full
text searchable databases, providing jurors with pre- and post-
trial jury charges in writing in the actual language used by the
judge, and transcript when requested by the jury, see e.g. Oscar
Criner, Professor of Organizational Behavior, Remarks to the
American Board of Trial Advocates (Apr. 2005) (emphasizing the
improvement in the quality of justice were transcripts to be
provided to deliberating jurors); All Things Considered: American
Bar Association Studies Lead to New Principles for Juries (NPR
News radio broadcast, Jun. 9, 2005) (noting that Professor Criner
"was foreperson of the jury that convicted accounting firm Arthur
Andersen on charges relating to the Enron scandal."); see also
Arthur Andersen LLP v. United States, 125 S.Ct. 2129 (2005), then
shallow rhetoric about a judicial "crisis" is yesterday's news
and the "crown jewel" of the world's trial court systems -- the
United States District Courts -- is banking into a steep decline
in the quality of support it affords the American jury and the
quality of justice it offers our citizens.

The consequences for American democracy cannot be
overstated.  See Mark Galanter, The Hundred-Year Decline of
Trials and the Thirty Years War, 57 Stan. L. Rev. 1255, 1272-1274
(2005) ("The recent accelerated decline in the number of trials
is . . . part of a much broader turn from law, a turn away from
the definitive establishment of public accountability in
adjudication. . . . It is embedded in the changing work habits of
judges and lawyers who rarely engage in trials. . . . The recent
decline of trials is not likely to be reversed without reversal
of the larger turn away from the law.  To a great extent, the
turn is based on a set of misperceptions about judges, trials,
and juries that is shared by courts and lawyers as well as
businesspeople and politicians. . . . The animus against trials
is not just an objection to generous or individuated remedies; it
also involves an aversion to the determination of corporate

106

accountability in public forums.  The trial is a site of 'deep accountability' where facts are exposed and responsibility assessed, a place where the ordinary politics of personal interaction are suspended and the fictions that shield us from embarrassment and moral judgment are stripped away.  There is no formula that will yield the right number or percentage of trials. But if we want a legal system in which judges and juries devise public standards and assess accountability, particularly that of powerful actors, we need enough trials to do that job." (footnotes omitted)) ; William G. Young, An Open Letter at 33 ("For decades, our civil juries have been incessantly disparaged by business and insurance interests, without the courts offering any defense of the single institution upon which their moral authority ultimately depends, with the predictable result that bipartisan majorities in the Congress have severely restricted access to the American jury.  These interests know what they are doing.  The most sophisticated recent analysis has led one commentator to conclude, 'a civil justice system without a jury would evolve in a way that more reliably serve[s] the elite and business interests.' [Valerie G. Hans, Business on Trial: The Civil Jury and Corporate Responsibility 226-227 (2000)]." (footnotes omitted, internal citation added)); id. at 32 ("Whenever Congress extinguishes a right that heretofore has been vindicated in the courts through citizen juries, there is a cost. It is not a monetary cost.  It is a cost paid in rarer coin — the treasure of democracy itself. When people recognize that they have been cut off from their opportunity to govern directly through citizen juries, the sense of government as community — as a shared commonwealth — is severely diminished.  Jury service is the citizen's only direct experience of government at the federal level.  Severing that shared bond, of course, leaves citizens with their right to vote but, inevitably, as the government draws away from its citizenry, that right seems less valuable.  It is not too much to say that, as our government is the ultimate teacher, its devaluation of direct citizen participation carries the implicit message that communitarian efforts are simply not worth very much in an age of individual self-seeking.  Nor is this all.  As those institutions that empower and reinforce community efforts fray at the edges and fall into desuetude, economic powers to which the law grants an advantage naturally tend to use that advantage, unchecked by the jury's common sense. Without juries, the pursuit of justice becomes increasingly archaic, with elite professionals talking to others, equally elite, in jargon whose elegance is in direct proportion to its unreality.  Juries are the great leveling and democratizing element in the law.  They give it its authority and generalized

is confident of its own analysis of the matter, it is of opinion that the issue here warrants a section 1292(b) interlocutory appeal and certification to the United States Court of Appeals for the First Circuit is appropriate.

Therefore, pursuant to 28 U.S.C. § 1292(b), the Defendants shall have ten (10) days from the date of the entry of this Memorandum and Certification to appeal to the Court of Appeals for the First Circuit. The controlling question of law worthy of First Circuit review and certified to the First Circuit is: does ERISA preempt state law claims against an insurer, an insurance agency, and an insurance agent stemming from misrepresentations and assurances made by the insurance agent (acting on behalf of the insurer) in connection with the establishment of an employee

---

acceptance in ways that imposing buildings and sonorous openings cannot hope to match. Each step away from juries is a step that ultimately weakens the judiciary as the third branch of government. Indeed, it may be argued that the moral force of judicial decisions — and the inherent strength of the third branch of government itself — depends in no small measure on the shared perception that democratically selected juries have the final say over actual fact-finding." (footnotes omitted)).

Some there are who are apparently pleased with this tailspin. Peter Wallsten, 2 Evangelicals Want to Strip Courts' Funds, L.A. Times (Apr. 22, 2005) (quoting House Majority Leader Tom Delay as saying, "We set up the courts. We can unset the courts. We have the power of the purse," and James C. Dobson, founder of Focus on the Family, as saying, "Very few people know this, . . . that Congress can simply disenfranchise a court[.] They don't have to fire anybody or impeach them or go through that battle. All they have to do is say the 9th Circuit doesn't exist anymore, and it's gone.").

"But let that bide." Captain Abel Jones, HQ Army of the Potomac, Late Sergeant, 24th Foot (South Wales Borderers) (from Owen Parry, Faded Coat of Blue (Avon Books, 1999)).

benefit plan.[58]  It is that court, and not this, which ultimately ought balance the importance of the certification question, and the relative certainty or lack thereof as to its answer on the present state of the law against the delay an appeal will cause Miara.  The Defendants are ordered to provide notice of such appeal, if any, to this Court.  The First Circuit may then exercise its statutory discretion to allow an immediate, interlocutory appeal with respect to the preemption issue and controlling question of law.  28 U.S.C. §§ 1292(b) and (c)(1). If, however, Defendants fail so to appeal in the statutory ten-day period, or if the First Circuit demurs and elects, in its rightful discretion, not to entertain an interlocutory appeal, then this Court will promptly remand Miara's state claims to the Massachusetts Superior Court sitting in and for the County of Suffolk for appropriate resolution of such claims on the merits.

SO CERTIFIED AND ORDERED.

/s/ William G. Young
_____
WILLIAM G. YOUNG
CHIEF JUDGE

---

[58] Virtually the same question was previously pondered by the District Court of Maine in <u>Stetson</u>, 16 F. Supp. 2d at 30-31. This, together with the case law from other circuits and from within this circuit, is further evidence of the value of a decision from the First Circuit on this matter.